UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

AMERISURE MUTUAL INSURANCE COMPANY,

    Plaintiff,

        v.

CAREY TRANSPORTATION, INC., a Florida
corporation, and GREAT WEST CASUALTY CO., as
subrogee of FEBRUARY FOURTEEN, INC.,

    Defendants.

_____

CAREY TRANSPORTATION, INC.,

    Counterclaim-Plaintiff,

        v.

AMERISURE MUTUAL INSURANCE COMPANY,

    Counterclaim-Defendant.

_____

CAREY TRANSPORTATION, INC.,

    Third-Party Plaintiff,

        v.

ADRIATIC INSURANCE COMPANY,

    Third-Party Defendant.

_____

Case No. 1:06-CV-892

HONORABLE PAUL MALONEY

## OPINION and ORDER

**Granting in Part & Denying in Part Amerisure's Motion for Summary Judgment;
Granting in Part & Denying in Part Carey Transport's Motion for Summary Judgment;**

**Granting Adriatic's Motion for Summary Judgment on Carey's Third-Party Complaint;**

**Terminating the Case**

**This is a diversity insurance coverage dispute governed by Michigan state law.** Plaintiff Amerisure Mutual Insurance Company ("Amerisure") issued a commercial trucker's insurance policy to defendant Carey Transportation, Inc. ("Carey"). Non-party February Fourteen, Inc. ("FFI") hired Carey to transport goods to Florida. Carey did so in May 2005, using its own tractor to pull an attached trailer owned by FFI. A fire broke out which damaged Carey's tractor, FFI's attached trailer, and cargo inside the trailer.

**Defendant Great West Casualty Company ("Great West") provided coverage to FFI.** In early 2006, Great West (as subrogee of FFI) sued Carey in this court, Civil Case No. 1:2006-cv-106 ("the underlying action"). Great West asserted claims for breach of contract, negligence, and strict liability under the federal statutory provision known as the Carmack Amendment. **In early 2006, Amerisure sent a letter to Carey entitled "Reservation of Rights",** advising that it believed that policy exclusion number 6 precluded coverage, that it reserved its right and defenses, and that it would investigate further. Exclusion 6 (hereinafter the "care, custody or control" exclusion) excludes coverage for "'property damage' to or 'covered pollution cost or expense' involving property owned or transported by the 'insured' or in the 'insured's' care, custody or control."

**In November 2006, Amerisure sent a second letter to Carey entitled "Reservation of**

**Rights",** this time advising that it believed policy exclusion number 2 *and* policy exclusion number 6 precluded coverage, and again reserving its rights and defenses and promising further investigation. Exclusion 2 (hereinafter "the contractual liability exclusion") excludes coverage for liabilities "assumed in a contract or agreement that is an 'insured contract' [as defined elsewhere in the policy,] provided that the 'bodily injury' or 'property damage' occurs subsequent to the execution of the contract or agreement." Exclusion 2 states that it admits two exceptions, which will be discussed below. About that same time, in late 2006, about six months after *Great West v. Carey* was instituted, Amerisure assumed Carey's defense. That action was stayed pending resolution of the instant action.

      **In this action, Amerisure asserts claims for** declaratory relief under the federal Declaratory Judgment Act, and for restitution and unjust enrichment under Michigan common law. Amerisure seeks a declaration that it has no duty to indemnify Carey or Great West because the Amerisure-Carey policy's exclusions 2 and 6 each eliminate coverage for all types of damages sought in the underlying action. Amerisure also seeks a declaration that it has no duty to defend Carey in the underlying action, and that it is therefore entitled to recoup the expenses it has incurred defending Carey in the underlying action. Amerisure and Carey have cross-moved for summary judgment on the entire amended complaint. **For the reasons that follow, the court will grant summary judgment to Amerisure.**

      **Carey first contends that** Amerisure's March 2006 letter to Carey, although entitled "Reservation of Rights", constituted a final denial of coverage, and Carey was obligated to raise all potential grounds for denial of coverage at that time. Therefore, Carey contends, Amerisure waived or is estopped from invoking Exclusion 2, because its March 2006 letter failed to mention it as a

basis for denying coverage. The court rejects Carey's arguments on this score: the court determines that Amerisure's March 2006 letter was not a final or conclusive denial of coverage and could not reasonably have been perceived as such. Therefore, Amerisure's invocation of Exclusion 2 in its November 2006 letter was sufficient to permit Amerisure to rely on Exclusion 2 now as a basis for denying coverage. As a matter of law, the court also holds that, under these circumstances, the Michigan Supreme Court would adhere to the general rule announced in *Ruddock* (Mich. 1920) that waiver or estoppel will not operate against an insurer where doing so would require coverage that is not provided by the policy or is expressly excluded by the policy. Based on the Michigan Court of Appeals decisions in *Lee* (1995) and *Smits* (1995) and the decisions discussed therein, the Michigan Supreme Court *might* recognize the *Lee-Smits* exceptions to the *Ruddock* rule, but the exceptions would not apply here.

**As for Exclusion 6, the court determines** that it is not so broad or ambiguous as to violate federal or Michigan public policy as suggested by Carey. Nor is exclusion 6's phrase "care, custody or control" ambiguous so as to require a jury to decide, as a matter of fact, what Amerisure and Carey intended those words to mean. Rather, exclusion 6 is sufficiently clear that its interpretation is a question of law for the court, aided greatly by *Arrigos* (Mich. App. 1974)'s detailed explanation of what the phrase means and when it should be found to apply. The court then determines that Exclusion 6 applies and excludes coverage for all the damages at issue. The facts of this case satisfy both independent criteria for application of Exclusion 6. First, the tractor, the attached trailer, and the cargo were all being "transported" by the insured (Carey); the tractor is doubly excluded under the first part of Exclusion 6 because it was "owned" by the insured (Carey). Second, the tractor, the attached trailer, and the cargo were all within "the care, custody, or control" of the insured (Carey).

**The court next considers Exclusion 2,** which excludes coverage for "liability assumed by the insured (Carey)] under any contract or agreement."  Exception "a" provides that Exclusion 2 does not apply to liability for damages that the insured (Carey) "[a]ssumed in a contract or agreement that is an 'insured contract' [as defined elsewhere in the policy,] provided that the 'bodily injury' or 'property damage' occurs subsequent to the execution of the contract or agreement." Exception "b" provides that Exclusion 2 does not apply to liability for damages "[t]hat the 'insured' would have in the absence of the contract or agreement."  The court determines that Exception 2 applies, as Great West's complaint in the underlying action seeks to impose liability on Carey independent of any contract or agreement, namely liability for negligence under Michigan common law (count one in the underlying action) and strict liability under federal statute (count two in the underlying action).  Because Exception "b" applies, Exclusion 2 does not apply.  There is no need to determine whether Exception "a" might also apply.

Finally, Carey contends that Amerisure has a duty to defend it in the underlying action. Following Michigan authority that the duty to defend is broader than the duty to indemnify, **the court holds that Amerisure does have a duty to defend Carey in the underlying action.**

## BACKGROUND

The Amerisure-Carey Policy and Carey's Loss

Amerisure issued a commercial automobile insurance policy #CA-1307-5620-30004, to Carey effective July 20, 2004 through July 20, 2005.  *See* Am Comp ¶ 8 and Ex. G; Carey Ans ¶ 8; Great West Ans ¶ 8.[1]  In May 2005, FFI hired Carey to transport goods from Michigan to three

---

[1]

Amerisure's amended complaint (¶ 8) states that the policy was effective from July 20, 2004 through the same date, July 20, 2004.  This is obviously a typographical error, because the policy's

Walgreen's retail stores in Florida.  Carey made the first two deliveries without incident.  While

Carey was transporting the remaining goods to the third and final destination, the vehicle's front

steer bearings failed, causing a fire that spread and destroyed Carey's tractor (referred to in the

policy as a "power unit"), FFI's attached trailer, and FFI's cargo were destroyed.  Deposition of

Carey truck driver Derek Fowler ("Fowler Dep"), P's MSJ Ex D 74:20-25 and 75:1-10.  Great West

paid FFI  $74,392.63 (the value of the entire cargo minus FFI's deductible).  *See* Amerisure MSJ,

Ex (Deposition of Steven Carey ("Carey Dep")) 86:2-7.  (Carey has filed a third-party complaint

contending that the cargo loss is covered by its policy with Adriatic, but Adriatic refuses coverage

and has moved for summary judgment on the third-party complaint.)

The Underlying Action:  Great West (subrogee of FFI) v. Carey (Amerisure's Insured)

Great West, as subrogee of FFI, sued Carey in this court, alleging that the fire was caused

by Carey's negligent failure to maintain its tractor.  *See* Am Comp., Ex. F (Great West's Comp. filed

Feb. 10, 2006 in underlying action) ¶¶ 7-15.[2]

Amerisure first learned of the underlying action – *Great West v. Carey Transportation*, No.

---

declaration page lists the effective period as July 20, 2004 through a date about one year later, July
20, *2005*.  The court finds, without dispute from the parties, that the policy was effective July 20,
2004 through July 20, 2005.

[2]

Here is the procedural history of *Great West Cas. Co. v. Carey Transp., Inc. / Carey
Transp., Inc. v. February 14, Inc.*, Case No. 1:2006-cv-106, originally assigned to the Hon. Richard
Alan Enslen, Senior U.S. District Judge.  Carey timely answered in March 2006.  In July, with leave
of court, Carey filed a third-party complaint against FFI, which timely answered in August 2006.

The plaintiff there, Great West, moved for summary judgment, as did third-party defendant
FFI.  In August 2007, Judge Enslen denied both summary-judgment motions.  In November 2007,
on the joint stipulation of all the parties, Judge Enslen stayed the case pending entry of final
judgment in the instant case.  On July 31, 2008, case no. 1:2007-cv-106 was reassigned to this
Judge.

1:2006-cv-106 (W.D. Mich.) – on February 15, 2006, when it received a copy of the complaint from Great West.[3]   On March 10, 2006, Amerisure received another copy of the complaint in the underlying action, this time from its insured, Carey.[4]   On March 22, 2006, Amerisure received a letter advising that Great West had effected service on Carey in the underlying action.[5]


Amerisure's First Letter to Carey Entitled "Reservation of Rights", March 2006

On March 22, 2006, Amerisure sent Carey a letter entitled "Reservation of Rights." Amerisure's letter read, in pertinent part,

[Page 1, ¶ 3]  Because information available to us at this point is limited, we will proceed to investigate this claim subject to a full reservation of all of our rights and defenses.

[Page 1, ¶ 4]  Amerisure's conduct in handling this matter is subject to all of the terms, provisions and conditions of its policy.  Your attention is specifically drawn to the following, which precludes coverage of this claim.
* * *
[Page 3]  **B.  Exclusions**

This insurance does not apply to any of the following:
**6.  Care, Custody Or Control**
"Property damage" to or "covered pollution cost or expense" involving property owned or transported by the "insured" or in the "insured's" care, custody or control.  But this exclusion does not apply to liability assumed under a sidetrack agreement.
* * *
[Page 4] * * *  **The Plaintiff [Great West]'s complaint alleges that the trailer owned by February Fourteen, Inc. [FFI] and its cargo was under the care,**

---

3

*See* Amerisure's Opp to Carey's MSJ, Ex A at 1 (Letter of Feb. 15, 2006 from Great West counsel Aaron D. Wisely, Esq., to Amerisure's Jim Siatczynski).

[4]*See* Amerisure's Opp to Carey's MSJ, Ex B (Mar. 10, 2006 fax cover sheet).

[5]*See* Amerisure's Opp to Carey's MSJ, Ex A at 2 (Letter of Mar. 22, 2006 from Great West counsel Aaron D. Wisely, Esq., to Amerisure's Jim Siatczynski).

**custody and control of Carey Transportation, Inc. Similarly, *our investigation also has shown that the trailer and cargo were in Carey Transportation, Inc.'s care, custody and control. Therefore because of the above cited exclusion, there may not be coverage for this loss.***

**We will complete our coverage review process[,] and should it be determined that the Amerisure policy provides coverage on any part or all of this complaint, Carey Transportation, Inc. will be reimbursed for any legal costs that are reasonable and necessary.**

\* \* \*

[Page 5] Amerisure Insurance Company specifically reserves all rights and defenses under the policy and applicable law.

*Additionally, if information is subsequently discovered that would support additional defenses to coverage, Amerisure Insurance Company expressly reserves the right to supplement its coverage defenses.*

Amerisure's Opp to Carey's MSJ, Ex C (Letter of Mar. 22, 2006 from Amerisure counsel to Carey) at 1, 3, 4 and 5 (boldface in original, italics added). The court finds that this letter serves as an effective, timely reservation of rights, but not as a denial of coverage. The letter is not a clear, definitive, or final "denial" of coverage, and Carey could not reasonably perceive it as such. The letter is arguably internally inconsistent as to whether it is warning of the possible application of an exclusion or stating a firm position that an exclusion applies. Amerisure's letter first says unequivocally that "Your attention is specifically drawn to the following, *which precludes coverage* of this claim," *see* Page 1 ¶ 4 (emphasis added), going on to quote Exclusion 6, *see* Page 3. But then Amerisure backtracks, telling Carey on page 4, "[B]ecause of the above cited exclusion, there *may* not be coverage for this loss." Emphasis added.

Amerisure's March 22, 2006 reservation-of-rights letter also "strongly recommend[ed] that Carey Transportation, Inc. secure their own defense counsel at this time to provide a defense for Carey Transportation, Inc. in this lawsuit." Amerisure's Opp to Carey's MSJ, Ex C (Letter of Mar. 22, 2006 from Amerisure counsel to Carey) at 4.

<u>Amerisure's Second Letter to Carey Entitled "Reservation of Rights", November 2006</u>

Over half a year later, on November 13, 2006, Amerisure sent a second letter to Carey entitled Reservation of Rights. This letter for the first time called Carey's attention to Exclusion 2 (certain liabilities contractually assumed by the insured), stating that it precludes coverage – a provision that Amerisure had not mentioned in the first reservation-of-rights letter. *See* Amerisure's Opp to Carey's MSJ, Ex D (Letter of Nov. 13, 2006 from Amerisure counsel to Carey) at 1 & 3.

Amerisure's November 2006 letter again called Carey's attention to Exclusion 6 (property owned or transported by the Insured or in the "care, custody or control" of the Insured). This time, however, Amerisure stated only that its investigation found that *the trailer* was in Carey's "care, custody, or control" – not, as stated in the first letter, "the trailer *and cargo.*" *Contrast* Amerisure's Opp to Carey's MSJ, Ex C at 4 *with id.*, Ex D at 4.

Amerisure agreed to defend Carey, but explained its revised position regarding coverage:

[T]he cargo may not be covered because it was being "transported by" the insured when it was damaged.

We will provide a defense for the entire action, however the only area where there is potential for indemnity is for the Cargo inside the [FFI] Trailer. It is our position that there is no coverage for the trailer owned by February Fourteen, Inc. because it was within your driver's care, custody and control at the time of the loss.

Finally, the breach of contract claims are not covered by the policy because they are excluded by the contractual exclusion. The allegations by [FFI] are not for tort claims, but for Carey Transportation's failure to maintain its equipment. This does not fall within the definition of an insured contract and therefore, the contractual exclusion [Exclusion 2] applies.

Amerisure's Opp to Carey's MSJ, Ex D (Nov. 13, 2006 letter from Amerisure to Carey) at 4.

<u>Amerisure Files this Declaratory Judgment Action Against Its Insured, Carey</u>

-9-

Amerisure filed the instant action in December 2006, seeking, *inter alia*, a declaration that it does not have a duty to defend or indemnify Carey in the underlying coverage action (count one). In counts two and three, Amerisure asserts Michigan common-law claims for restitution and relief from unjust enrichment. Amerisure alleges that any attorney fees and other defense costs that it has paid in the underlying coverage action have benefitted and unjustly enriched Carey, and thus that Carey should disgorge said amounts to Amerisure. *See* Comp. ¶¶ 15-21.

Defendants Carey and Great West timely filed answers in March 2007. Carey's answer counterclaimed for a declaration that Amerisure has a duty to defend and indemnify Carey in the underlying coverage action, and an order requiring Amerisure to pay Carey both the costs it has incurred in this action and the costs it has incurred in the underlying coverage action. *See* Carey Ans at 3-5. Great West's answer sought a declaration that Amerisure has a duty to indemnify it for the damages sought by Great West in the underlying coverage action. *See* Great West Ans. at 4.

In May 2007, with leave granted by Magistrate Judge Carmody, defendant Carey filed a third-party complaint against Adriatic Insurance Company, Inc. ("Adriatic"), which timely answered that same month. Between July and November 2007, three parties – plaintiff Amerisure, defendant Carey, and third-party-defendant Adriatic – filed motions for summary judgment [document numbers 36, 56 and 58]. However, the court determined that Amerisure had not satisfied its burden of pleading facts sufficient to establish federal jurisdiction. Accordingly, by order issued October 29, 2007, the court dismissed the complaint without prejudice and authorized Amerisure to file an amended complaint to correct the deficiency within a certain period of time. The order denied the pending motions without prejudice.

On November 6, 2007, Amerisure timely filed an amended complaint. According to the

amended complaint, plaintiff Amerisure is incorporated in Michigan and maintains its principal place of business in Michigan; defendant Carey is both incorporated in Florida and maintains its principal place of business there[6]; and defendant Great West is both incorporated in Nebraska and maintains its principal place of business there.  *See* Am, Comp, ¶¶ 4-6 (citing Exs. A-E).  The defendants have either "admitted" or "not contested" Amerisure's revised citizenship allegations, *see* Carey's Ans, to Am. Comp.  ¶¶ 4-6 and Great West's Ans, to Am, Comp. ¶¶ 4-6, and the court determines that Amerisure has met its burden of establishing complete diversity of citizenship.

In November 2007, plaintiff Amerisure and defendant Carey cross-moved for summary judgment on the amended complaint [documents #73 and #75].  Defendants Great West and Carey filed separate opposition briefs [documents #80 and #83/84]; and Amerisure filed an opposition brief [document #79] and two reply briefs [document #82 and #85].

Also in November 2007, third-party defendant Adriatic moved for summary judgment on Carey's third-party complaint [document #70], which involves a cargo-insurance policy that Adriatic issued to Carey.  Third-party plaintiffs Carey and Great West filed opposition briefs [documents #72 and #77], but Adriatric did not file a reply brief.

## DIVERSITY JURISDICTION

When sitting in diversity jurisdiction, this court must apply the choice-of-law rules and, if applicable, the substantive law of the forum State, Michigan.  *CenTra, Inc. v. Estrin*, – F.3d –, –, 2008 WL 3540081, *5 (6th Cir. 2008) (citing *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir.

---

[6]

By contrast, the original complaint alleged that defendant Carey had its principal place of business in Sparta, Michigan, *see* Orig Comp ¶ 5, which would have defeated diversity jurisdiction.

2003)); *see also Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) ("We generally apply the substantive law of the forum state to actions brought pursuant to our diversity jurisdiction.") (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).  This rule applies in insurance-coverage actions brought in diversity.  *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 536, 563 (6th Cir. 2008) (citing *Talley v. State Farm Cas. & Fire Co.*, 223 F.3d 323, 326 (6th Cir. 2000)).

When interpreting contracts in a diversity action, the federal courts also "generally enforce the parties' contractual choice of governing law." *Savedoff*, 524 F.3d at 762 (citing *Carnival Cruise Lines, Inc. v. Schute*, 499 U.S. 585, 596 (1991) and *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)).  As the parties do not dispute that the Amerisure-Carey policy is governed by Michigan substantive law, the court applies Michigan law to this dispute.  *See Savedoff*, 524 F.3d at 762 ("As the parties do not dispute that the student loan contracts at issue are governed by Ohio law, we apply Ohio law to the parties' contractual dispute.").

## A FEDERAL COURT'S APPLICATION OF STATE LAW

"'In applying state law, we anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court.'" *Appalachian Railcar Servs. v. Boatright Enters., Inc.*, – F. Supp.2d –, –, 2008 WL 828112, *14 (W.D. Mich. 2008) (Paul L. Maloney, J.) ("*ARS*") (quoting *NUFIC of Pittsburgh, Pa. v. Alticor, Inc.*, 472 F.3d 436, 438 (6th Cir. 2007) (Richard Allen Griffin, J.) (citation omitted)).

If the state supreme court has not conclusively decided the issue, a federal court presumptively looks to the decisions of the state's appellate courts:  "In anticipating how the state supreme court would rule, 'we look to the decisions of the state's intermediate courts unless we are

-12-

convinced that the state supreme court would decide the issue differently.'" *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *US v. Lancaster*, 501 F.3d 673, 679 n.3 (6th Cir. 2007) (Griffin, J.) (citation omitted)).  In determining what is the controlling law of the State, a federal court also "*may* give weight" to the decisions of the State's trial courts, *Bradley v. GMC*, 512 F.2d 602, 605 (6th Cir. 1975) (citing *Royal Indem. Co. v. Clingan*, 364 F.2d 154 (6th Cir. 1966)), especially when the trial court's decision is consistent with state appellate decisions, *Bradley*, 512 F.2d at 605.

## PRECEDENTIAL VALUE OF MICHIGAN DECISIONS

A federal court must accord the same precedential value to a state-court decision as it would be accorded by that state's courts.  *See ARS*, – F. Supp.2d at *14 (citing *Mutuelle Generale Francaise Vie v. Life Ass. Co. of Pa.*, 688 F. Supp. 386, 397 n.15 (N.D. Ill. 1988) ("[O]ne Supreme Court decision (*Fidelity Union Trust Co. v. Field*, 311 U.S. 169 . . . (1940)) . . . required a federal court to ascribe the same precedential force to a New Jersey trial court decision that such a decision would receive in that state's court system under the peculiarities of New Jersey law.")).  If a state court would not be bound by a particular state-court decision, then neither is this court.  *ARS*, – F. Supp.2d at *14 (citing *King v. Order of United Commercial Travelers of Am.*, 333 U.S. 153, 161 (1948) ("a federal court adjudicating a matter of state law in a diversity suit is, in effect, only another court of the State; it would be incongruous indeed to hold the federal court bound by a decision which would not be binding on any state court.") (citation omitted)).

MICH. CT. R. 7.215(C)(2) states that "[a] published decision of the Court of Appeals has precedential value under the rule of stare decisis."  This subsection makes no distinction based on when the decision was issued..  *ARS*, – F. Supp.2d at *14.  However, MICH. CT. R. 7.215(J)(1)

-13-

provides that "[a] panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals *issued on or after November 1, 1990*, that has not been reversed or modified by the Supreme Court or by a Special Panel of the Court of Appeals as provided in this rule." . *ARS*, – F. Supp.2d at *14 (emphasis added).

Synthesizing MICH. CT. RR. 7.215(C)(2) and 7.215(J)(1), the Michigan Court of Appeals accords precedential value to *all* of its prior published decisions, regardless of when they were issued. *ARS*, – F. Supp.2d at *14. When a post-November 1, 1990 published Court of Appeals decision conflicts with a *pre*-November 1, 1990 published Court of Appeals decision, however, the *post*-November 1, 1990 decision prevails. *Id.*

When there is a conflict between two published decisions of the Court of Appeals that were *both* issued *after* November 1, 1990, Michigan courts follow the first opinion that addressed the matter. *ARS*, – F. Supp.2d at *15 (citing *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W. 2d 546, 554 (Mich. App. 1999) (citation omitted)).

By contrast, Michigan Court of Appeals panels are not bound by *un*published decisions of that same court, regardless of when they were issued. *ARS*, – F. Supp.2d at *15 (citing *Iqbal v. Bristol West Ins. Group*, 748 N.W.2d 574, 582 n.5 (Mich. App. 2008) (citing Mich. Ct. R. 7.215(J)(1))). Nonetheless, this court may consider and follow unpublished state-court decisions, so long as they do not contradict published decisions of the Michigan Supreme Court or Michigan Court of Appeals. *See Republic-Franklin Ins. Co. v. Bosse*, 1996 WL 301722, *5 n.4 (6th Cir. June 4, 1996) (although unpublished decisions are not generally controlling under Ohio law, "[w]e cite them, nevertheless, due to our sensitivity to state law in deciding diversity cases.") (citing *Royal Indem. Co.*, 364 F.2d at 154 ("Although we are not bound in a diversity case by an unreported

-14-

decision of a State court of original jurisdiction, we may give weight to this [unreported] decision of the chancery [court] in determining what is the controlling [state] law.")).

Finally, a federal court's interpretation of state law is not binding. *ARS*, – F. Supp.2d at *14 (citing *Leavitt v. Jane L.*, 518 U.S. 137, 146 (1996) (Stevens, J., dissenting o.g., joined by Souter, Ginsburg, & Breyer, JJ.) ("[T]he decision of a federal court (even this Court) on a question of state law is not binding on state tribunals . . . .")).  Accordingly, this court will seriously consider our Circuit's interpretation of Michigan law but is not bound by it.  *See ARS*, – F. Supp.2d at *15.[7]

## AMERISURE'S DUTY TO INDEMNIFY

Interpretation of Insurance Policies under Michigan Law.

"An insurance policy is much the same as any other contract.  It is an agreement between the parties in which a court will determined what the agreement was and effectuate the intent of the parties."  *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 433-34 (Mich. 1992) (citing *Eghotz v. Creech*, 113 N.W.2d 815, 818 (Mich. 1962)).  Michigan courts read an insurance contract as a whole, giving meaning to all terms.  *Helsel v. Farm Bureau Gen. Ins. Co.*, 2008 WL 2357546, *2 (Mich. App. June 10, 2008) (p.c.) (citing *Churchman*, 489 N.W.2d at 434 (citing *Fresard v. Michigan Millers Mut. Ins. Co.*, 327 N.W.2d 286, 288 (Mich. 1982))).

Any insurance policy clause is valid as long as it is clear, unambiguous, and not in contravention of public policy.  *Churchman*, 489 N.W.2d at 434 (quoting *Raska v. Farm Bureau Mut. Ins. Co. of Mich.*, 314 N.W.2d 440 (Mich. 1982)).  This rule stems from the fact that "freedom

---

[7]

*Contrast Sequa Corp. v. Elyria Foundry Co.*, 2006 WL 2849736, *10 (N.D. Ohio Sept. 29, 2006) ("[T]his court is bound by Sixth Circuit precedent, even on its interpretation of Ohio law . . . .") (citing no authority).

of contract is a much- and long-revered doctrine in American jurisprudence." *Fresard*, 327 N.W.2d at 288. "The general rule is that competent persons shall have *the utmost liberty* of contacting and that their agreements voluntarily and fairly made shall be held valid and enforced by the courts." *New Freedom Mortg. Corp. v. Globe Mortg. Corp.*, 664 N.W.2d 776, 787-87 (Mich. 2003) (emphasis added) (citing *Terrien v. Swit*, 648 N.W.2d 602, 611 (Mich. 2002) (citing *Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U.S. 353, 356 (1931) (Butler, J, for a unanimous Court))). Under this principle, parties are generally free to agree to whatever they like, and, in most circumstances, it is beyond the authority of the courts to interfere with their agreement. *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 787 (Mich. 2003) (citing *St. Clair Intermed. Sch. Dist. v. Intermed. Ed. Ass'n*, 581 N.W.2d 707 (Mich. 1998)).

If the contract's language is clear, its interpretation is a question of law to be decided by the court. *Helsel*, 2008 WL 2357546 at *2 (citing *Taylor v. Blue Cross & Blue Shield*, 517 N.W.2d 864, 868 (Mich. App. 1994)). The court cannot create ambiguity where none exists. *Churchman*, 489 N.W.2d at 434 (citing *Edgar's Warehouse, Inc. v. USF&G Co.*, 134 N.W.2d 746 (Mich. 1965)). An insurance contract is clear and unambiguous if, "however inartfully worded or clumsily arranged, [it] fairly admits of but one interpretation." *Helsel*, 2008 WL 2357546 at *2 (citing *Farm Bureau Mut. Ins. Co. v. Nikkel*, 596 N.W.2d 915, 919 (Mich. 1999)). By contrast, an insurance contract is ambiguous "'if, after reading the entire contract, its language reasonably could be understood in differing ways.'" *Helsel*, 2008 WL 2357546 at *2 (quoting *Taylor*, 517 N.W.2d at 868).

If contractual language, such as Exclusion 6's "custody, care, or control of the insured", were ambiguous, the meaning of the ambiguous language would be a question of fact for the jury. *GMC v. Auto. Servs.*, 2008 WL 3155965, *4 (Mich. App. Aug. 7, 2008) (citing *Klapp v. United Ins. Group*

-16-

*Agency, Inc.*, 663 N.W.2d 447, 453-54 (Mich. 2003) (citing *Hewett Grocery Co. v. Biddle Purch.*

*Co.*, 286 N.W. 221, 225 (Mich. 1939))).  As the Michigan Supreme Court has explained,

> Where a contract is to be construed by its terms alone, it is the duty of the court to interpret it; but where its meaning is obscure and its construction depends upon other and extrinsic facts in connection with what is written, the question of interpretation should be submitted to the jury, under proper instructions.

*Klapp*, 663 N.W.2d at 454 (quoting *O'Connor v. March Automatic Irrig. Co.*, 218 N.W. 784 (Mich.

1928)).  The jury would ascertain what the parties intended by interpreting the contract's terms in

light of the apparent purpose of the contract as a whole, the rules of construction, and extrinsic

evidence of intent and meaning. *Klapp*, 663 N.W.2d at 454 (citing 11 WILLISTON ON CONTRACTS

(4th ed.) § 30:7, pp. 87-91).  The jury would be allowed to consider extrinsic evidence as to the

parties' contemporaneous understanding of the agreement and its terms, including "the parties'

conduct, the statements of its representatives, and past practice to aid in interpretation." *Klapp*, 663

N.W.2d at 454 (citing *Penzien v. Dielectric Prods. Eng. Co.*, 132 N.W.2d 130, 132 (Mich. 1965)).


Michigan courts construe ambiguities against the insurer, *Allstate Ins. Co. v. Vaughn*, 2006

WL 3077514, *2 (Mich. App. Oct. 31, 2006) (citing *State Farm Mut. Auto Ins. Co. v. Enterprise*

*Leasing Co.*, 549 N.W.2d 345, 351 (Mich. 1996)), *app. denied*, 739 N.W.2d 624 (Mich. 2007),

which means that

> [i]f a fair reading of the entire contract of insurance leads one to understand that there is coverage under particular circumstances and another fair reading of it leads one to understand [that] there is no coverage under the same circumstances[,] the contract is ambiguous and should be construed against its drafter to provide coverage.

*Enterprise Leasing*, 549 N.W.2d at 351 (quoting *Raska*, 314 N.W.2d at 440).  Nonetheless, the

Supreme Court cautions that "[t]he rule of *contra proferentum* is a rule of last resort because '[t]he

primary goal in the construction or interpretation of any contract is to honor the intent of the parties.'" *Klapp*, 663 N.W.2d at 456 (quoting *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (Mich. 1994) (citing, *inter alia*, *Stine v. Continental Cas. Co.*, 349 N.W.2d 127, 137 (Mich. 1984)).[8]

---

8

The *contra proferentum* rule

is not actually one of interpretation, because its application does not assist in determining the meaning that the two parties gave to the words, or even the meaning that a reasonable person would have assigned to the language used. It is chiefly a rule of policy, generally favoring the underdog. It directs the court to choose between two or more possible reasonable meanings on the basis of their legal operation, i.e., whether they favor the drafter or the other party.

*Klapp*, 663 N.W.2d at 456 (citing 5 CORBIN ON CONTRACTS (1998 ed.) at 306). Justice Cavanagh concurred in the result without opinion, and Justices Weaver and Kelly issued a concurring opinion. The *Klapp* majority, per Justice Markman, expressly rejected the concurring opinion's view that

"when a contract is drafted entirely by one party, without any bilateral negotiations," the rule of *contra proferentum* "should be applied as the primary rule of construction, not as a last resort." That is, when a contract whose language is ambiguous is drafted without bilateral negotiations, a jury should not be allowed to look at relevant extrinsic evidence in order to discern the parties' intent. Instead, the ambiguous language is simply to be construed against the drafter.

We respectfully disagree . . . .

* * *

[W]here . . . it is not possible to determine the parties' intent from the language of their contract, the *next* best way to determine the parties' intent is to use relevant extrinsic evidence. Such evidence at least affords a way by which to ascertain the parties' intent, unlike the rule of *contra proferentum*, which focuses solely on the status of the parties to a contract.

*Klapp*, 663 N.W.2d at 457. The concurrence professed agreement with the majority's principle that "[t]he ultimate objective in interpreting an ambiguous contract is to ascertain the intent of the parties." *Klapp*, 663 N.W.2d at 457 (discussing *id.*, 663 N.W.2d at 461 (Weaver, J., joined by Kelly, J., concurring)). In light of that, the majority remarked critically, "ultimately [the concurrence] concludes that the 'public-policy' interests in 'provid[ing] a strong incentive for a party drafting a contract to use clear and unambiguous language' and to avoid 'more involved litigation' somehow overrides this 'ultimate objective.'" *Klapp*, 663 N.W.2d at 457.

-18-

Moreover, Michigan courts strictly construe exclusions in favor of the insured. *Vaughn*, 2006 WL 3077514 at *2 (citing *McKusick v. Travelers Indem. Corp.*, 632 N.W.2d 525, 528 (Mich. App. 2001) (citing, *inter alia*, *Fire Ins. Exchange v. Diehl*, 545 N.W.2d 602, 606 (Mich. 1996)).

Nonetheless, the court must give effect to clear and specific exclusionary clauses, *McKusick*, 632 N.W.2d at 528, because "an insurer cannot be held liable for risks it did not contract to assume." *Farm Bureau Gen. Ins. Co. v. Duncan*, 2008 WL 3540203, *1 (Mich. App. Aug. 15, 2008) (p.c.) (P.J. Davis, JJ. Wilder & Borrello) (citing *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447 (Mich. 2003) and *So. Macomb Disposal Auth. v. Am. Ins. Co.*, 572 N.W.2d 686, 695 (Mich. App. 1997)). This comports with the general principle that "[r]espect for freedom entails that we enforce only those obligations actually assented to by the parties." *Coates v. Bastian Bros., Inc.*, 741 N.W.2d 539, 547 n.7 (Mich. App. 2007) (citing *Evans v. Norris*, 6 Mich. 369, 372 (Mich. 1859)), *app. denied*, 747 N.W.2d 545 (Mich. 2008).

At least one Court of Appeals panel called this "[p]erhaps the most fundamental rule of Michigan insurance jurisprudence . . . that an insurer can never be held liable for a risk it did not assume and for which it did not charge or receive any premium." *Dunn v. Detroit Auto. Inter-Ins. Exchange*, 657 N.W.2d 153, 159 (Mich. App. 2002) (citing, *inter alia*, *Ruddock v. Detroit Life Ins. Co.*, 177 N.W. 242, 248 (Mich. 1920)). *See, e.g., Matich v. Modern Research Corp.*, 420 N.W.2d 67, 75 (Mich. 1988) (Robert P. Griffin, J.) (in context of prejudgment interest following judgment for the insured, "the insurer should be liable only for the interest that accrues on the amount of risk it has assumed. Otherwise, it would be paying interest on a risk it did not assume and for which it did not charge premiums.") (citing *Cosby v. Pool*, 194 N.W.2d 142, 146 (Mich. App. 1971)).

<u>Amerisure Concedes that there is Coverage, *Before Considering the Exclusions*</u>

To determine whether Amerisure is obligated to indemnify Carey or Great West, the court engages in a two-step analysis. First, the court must decide if the occurrence section of the Amerisure-Carey policy includes the particular occurrence; if so, the court must then decide if coverage is denied under one of the policy's exclusions. *Fire Ins. Exch. v. Diehl*, 545 N.W.2d 602, 605 (Mich. 1996) (citing *Heniser v. Frankenmuth Mut. Ins.*, 534 N.W.2d 502, 510 (Mich. 1995)).

As the insured, it is Carey's burden to show that the occurrence falls within the terms of the policy. *Heniser*, 534 N.W.2d at 510 (citing, *inter alia*, *Arco Indus. Corp. v. Am. Motorists Ins. Co.*, 531 N.W.2d 168 (Mich. 1995)). Exclusions do not come into play until and unless the insured first shows coverage under the policy's more-general terms. *See Heniser*, 534 N.W.2d at 510 ("Policy exclusions are based on the assumption that the insured already has established that the policy covers the property in question.").

Here, Carey's burden of proving pre-exclusion coverage is satisfied, because Amerisure concedes that the policy covers the loss if no exclusions apply. The main liability coverage provision of the Amerisure-Carey policy reads as follows, in pertinent part,

SECTION II - LIABILITY COVERAGE

A.      Coverage

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto."

Amerisure's MSJ Ex B.

The court is obligated to follow the policy's definitions, *see Am. Axle & Mfg. Holdings, Inc. v. NUFIC of Pittsburgh, Pa.*, 2007 WL 4245408, *4 (Mich. App. Dec. 4, 2007) (citing *Cavalier Mfg.*

-20-

*Co. v. Employers Ins. of Wausau*, 564 N.W.2d 68, 70-71 (Mich. App. 1997) (citing *Allstate Ins. Co.*

*v. Freeman*, 443 N.W.2d 734, 739 (Mich. 1989) (C.J. Riley, joined by J. Robert P. Griffin))), *app.*

*denied*, 748 N.W.2d 568 (Mich. 2008), and the policy defines the relevant terms as follows:

> A.   "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage."
>
> B.   "Auto" means a land motor vehicle, "trailer" or semitrailer designed for travel on public roads but does not include "mobile equipment."
>
>                           \* \* \*
>
> F.   "Insured" means any person or organization qualifying as an insured the Who Is An Insured provision of the applicable coverage. Except with respect to the Limit of Insurance, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or "suit" is brought.
>
> M.   "Property damage" means damage to or loss of use of tangible property.
>
> O.   "Trailer" includes [a] semitrailer or a dolly used to convert a semitrailer into a trailer. But for Trailer Interchange Coverage only, "trailer" also includes a container.

Amerisure's MSJ Ex B. Amerisure concedes that both the tractor and the attached trailer qualify

as covered autos, *see* Amerisure's MSJ at 7-8 with nn. 22 & 23 (citing Ex B's Commercial Auto

Coverage Part Truckers Coverage Form Declarations and Schedule of Autos), and Amerisure is

silent as to whether the other conditions of coverage are met (prior to exclusions). Amerisure raises

no question that Carey was an "Insured"; that the incident in which Carey sustained the loss was an

"accident"; that the loss sustained by Carey (and paid for by Great West) in that accident constitutes

"property damage."

      The court determines that presumptive coverage is established, subject to the potential

application of Exclusion 2 and/or Exclusion 6.

-21-

<u>Waiver & Estoppel Do Not Apply on the Ground of Inadequate Reservation of Rights:
Amerisure Adequately Reserved Its Rights More Than Once,
Giving Carey Notice of Potential Grounds for Denial of Coverage</u>

There are two grounds on which a Michigan court might consider estopping Amerisure from denying coverage under these circumstances.

First, M.C.L. § 500.2122(1) provides, in pertinent part, that "[a]n insurer or agent, upon making a declination of insurance, shall inform the applicant of each specific reason for the declination." Applying this provision, Michigan courts hold that generally, once a company has denied coverage to an insured and stated its defenses, the insurance company has waived or is estopped from asserting new defenses. *Kirschner v. Process Design Assocs., Inc.*, 592 N.W.2d 707, 709 (Mich. 1999) (citing, *inter alia*, *Johnson v. Yorkshire Ins. Co.*, 195 N.W. 45, 46 (Mich. 1923)). *See, e.g., Blundy v. Secura Ins.*, 2008 WL 2596603, *2 (Mich. App. July 1, 2008) ("Defendant finally argues that Jason was barred from obtaining no-fault benefits under MCL 500.3101 and 500.3113(b) because he failed to obtain a separate insurance policy. This issue has been waived because defendant's correspondence attempting to void the policy did not set forth this reason.") (citing *Kirschner*, 592 N.W.2d at 709). Carey contends that Amerisure's March 2006 letter, denominated "reservation of rights", was actually a denial of coverage, such that Amerisure could not later invoke any exclusion that it did not mention in that letter. The court will reject Carey's argument on this score below.

Second, when a carrier undertakes the defense of its insured, it has a duty to give reasonable notice to the insured that it is proceeding under a reservation of rights, or it will be estopped from denying its liability. *Kirschner*, 592 N.W.2d at 709 (citing *Meirthew v. Last*, 135 N.W.2d 353, 356 (Mich. 1965)) (footnote 3 omitted).

The court finds that Amerisure's March 2006 letter to Carey entitled "Reservation of Rights" – sent less than three months into *Great West v. Carey*, shortly after Amerisure was informed that Carey had been served in that action – constituted an adequate reservation of rights in terms of its substance.  The court also finds that Amerisure sent the letter early enough, in relation to the underlying action, to avoid estoppel on this ground.  "Since *Meirthew* [(Mich. 1965)], this Court has held that a delay of four months between the initiation of the underlying action and the date that [the] insurer sends the reservation-of-rights letter is, 'as a matter of law, not an unreasonable length of time.'" *Dale Osburn, Inc. v. Auto-Owners Ins. Co.*, 2003 WL 22718194, *3 (Mich. App. Nov. 18, 2003) (P.J. Whitbeck, JJ. Zahra & Donofrio) ("Auto Owners issued its reservation-of-rights letter . . . less than four months after Dennis Claffey filed his lawsuit . . . .  Thus, we conclude the letter was timely.") (citing *Fire Ins. Exch. v. Fox*, 423 N.W.2d 325, 3 (Mich. App. 1988)); *see also Allstate Ins. Co. v. Harris*, 2001 WL 672596, *2 (Mich. App. Apr. 24, 2001) (p.c.) (P.J. Smolenski, JJ. Holbrook & Gage) (reservation-of-rights letter sent "about five months after the complaint was filed in the underlying tort action" was timely); *contrast Multi-States Transp., Inc. v. Michigan Mut. Ins. Co.*, 398 N.W.2d 462 (Mich. App. 1986) (reservation-of-rights letter sent two years after start of underlying lawsuit was not timely).

The court also finds that Amerisure's November 2006 letter to Carey, likewise entitled "Reservation of Rights", also independently serves as a timely and substantively-adequate reservation of rights sufficient to avoid estoppel on this ground.  That letter made clear that notwithstanding Amerisure's offer to defend Carey, it was proceeding with its rights reserved, including the right to invoke Exclusions 2 and 6.  *See Kreindler v. Waldman*, 2006 WL 859447, *2 (Mich. App. 2006) (p.c.) (P.J. Owens, JJ. Kelly & Fort Hood) ("Although defendant initially agreed

-23-

to defend Goldstone, it did so under an explicit reservation of rights.  Because defendant timely notified Goldstone that it was proceeding under a reservation of rights, it is not estopped from denying coverage.") (citing *Kirschner*, 592 N.W.2d at 709).

In any event, even if Amerisure's March and November 2006 letters were not adequate reservations of its rights, its filing of the instant action in December 2006 was certainly an adequate reservation of rights.  "A declaratory judgment action is a suitable alternative to sending the insured a reservation of rights letter." *Auto. Club Group Ins. Co. v. Rush*, 2006 WL 171494, *5 (Mich. App. Jan. 24, 2006) (citing *Multi-States Transp., Inc. v. Michigan Mut. Ins. Co.*, 398 N.W.2d 462 (Mich. App. 1986) (citing *Security Ins. Co. of Hartford v. Daniels*, 245 N.W.2d 418 (Mich. App. 1976))).

The fact that the underlying action was pending for some months before Amerisure filed this action does not establish undue prejudice to Carey, as would be required for a finding that the action came too late to serve as a reservation of rights in fairness to Carey.  When Amerisure filed this action, the underlying action had not progressed far:  Judge Enslen had not yet held the initial Case Management and Scheduling Conference, and no party had filed a dispositive motion, let alone started preparing for trial.  Moreover, Judge Enslen stayed the action pending resolution of this action.  Thus, before Carey has to decide whether to file a dispositive motion, settle, or go to trial in the underlying action, it will know the grounds on which Amerisure denied coverage, and it will know (due to the instant decision) whether Amerisure has a duty to indemnify and/or defend it.

The Michigan Court of Appeals recently endorsed an insurer's declaratory-judgment action as an adequate and timely reservation of rights in a similar situation.  In *Auto. Club Group Ins. Co. v. Rush*, 2006 WL 171494 (Mich. App. Jan. 24, 2006) (p.c.), the insured argued that he was unfairly prejudiced, and the insurer should be estopped from denying coverage,

because the delay in filing a reservation of rights denied [the insured] Rush a fair and timely opportunity to settle with Leach and to conduct discovery in the underlying suit to avoid application of the exclusion and support a finding of coverage.

*Rush*, 2006 WL 171494 at *4.  The panel, P.J. Cavanagh and JJ. Hoekstra & Markey, rejected the

insured's argument, writing:

> In *Meirthew* [*v. Last*, 135 N.W.2d 353 (Mich. 1965)], the insurance company defended its insured; it did not give notice of an exclusion on which it intended to rely until it lost the principal lawsuit. [*Meirthew*, 135 N.W.2d at 354-55.] Our Supreme Court held that the insurance company's failure to give reasonable notice of the exclusionary clause prejudiced the insured. [*Meirthew*, 135 N.W.2d at 356.] [9] Unlike *Meirthew*, here, plaintiff brought its declaratory judgment action against Rush and defendant Leach before a trial in the [underlying] wrongful death suit, giving clear notice that it intended to deny coverage on the basis of the "recreational land motor vehicle" provision.  * * *  Thus, *Meirthew* is inapposite.
>
> Moreover, *there is no evidence that the timing of plaintiff's declaratory judgment action prejudiced either Rush or defendant Leach.  The trial court repeatedly adjourned trial in the wrongful death suit during the pendency of this declaratory judgment action.  The court also stayed indefinitely trial in the wrongful death suit pending the outcome of this appeal.  Thus, Rush has been given ample time to negotiate an independent, pretrial settlement with defendant Leach.*  We find no basis to create [by estopping the insurer from denying coverage] a liability plaintiff never assumed in its contract with Rush.

*Rush*, 2006 WL 171494 at *4-5 (emphasis and some paragraph breaks added).  While not bound to

follow this unpublished decision, the court finds it persuasive.

<u>Even if the Elements of Waiver/Estoppel Were Otherwise Present, Those Doctrines
Cannot Prevent the Insurer from Invoking Exclusions 2 and 6 Under These Circumstances</u>

"The application of waiver and estoppel is limited, and usually, the doctrines will not be

---

[9]*See also Westport Ins. Co. v. Kassem*, 2006 WL 1006586, *2 (Mich. App. 2006) (p.c.) (P.J. Cooper, JJ. Cavanagh & Fitzgerald) ("It was only after the trial court determined that Jawad was not liable that Westport sent Kassem its reservation of rights.  Under these circumstances, estoppel was appropriate. . . .").

applied to broaden the coverage of a policy to protect the insured against risks that were not included in the policy or that were expressly excluded from the policy." *Kirschner*, 592 N.W.2d at 709-10 (citing *Ruddock v. Detroit Life Ins. Co.*, 177 N.W. 242, 248 (Mich. 1920); *Lee v. Evergreen Regency Coop.*, 390 N.W.2d 183 (Mich. App. 1986)). As Michigan's Supreme Court explained long ago,

> The cases where the doctrine of waiver, or estoppel, has been applied have largely been cases where the insurance companies have relied on a forfeiture of the contract, upon breaches of the warranties and conditions to work such forfeitures; and in many such cases this court and other courts of last resort have held that if the companies have led the other party, to his prejudice, to his expense, to understand that such forfeitures, such breached of [sic] warranties and conditions, would not be insisted upon, then the companies would be estopped from asserting such defenses.[10]

---

[10] *See, e.g., Wolverine Mut. Ins. Co. v. Pack*, 1999 WL 33438134, *3 (Mich. App. 1999) (p.c.) (P.J. Holbrook, Murphy, Talbot) ("the . . . ruling did not allow the doctrine of equitable estoppel to create a new contract where one did not already exist. It merely prevented Wolverine from asserting a forfeiture based on Pack's failure to pay her premium by August 25 . . . .") (citing *Snarski*).

Michigan courts have permitted estoppel against an insurer in three other contexts where doing so resulted in coverage, but never to prevent an insurer from invoking an exclusion. *Cf.*:

*Morales v. Auto-Owners Ins. Co.*, 582 N.W.2d 776 (Mich. 1998) (Cavanagh, J., joined by four JJ.) (equitable estoppel prevented insurer from enforcing automatic non-renewal provision);

*Leverett v. Continental Cas. Co.*, 225 N.W. 515 (Mich. 1929) (by failing to demand payment of premium as required, insurer was estopped from setting up forfeiture of policy due to nonpayment; additionally, by accepting premium after it knew insured had passed the age limit for the policy, the insurer was estopped from terminating the policy due to the age limit) (distinguishing *Ruddock* and following *Hause v. Standard Acc. Ins. Co.*, 137 N.W. 694 (Mich. 1912));

*See also Thomas v. MEBS*, 2007 WL 1491837 (Mich. App. 2007), where the insurer denied coverage based on this language in the policy's "outpatient mental health benefits" section:

> all out-of-state inpatient care requires Michigan Blue Cross precertification prior to admittance to a facility. For additional information regarding this provision, contact the Benefit Administrator MEBS, at 1-800-968-6327.

*Id.* at *2. The panel of P.J. Cooper and JJ. Murphy and Neff held as follows:

> It is undisputed that plaintiffs did not request or obtain pre-certification from

But here defendant makes no claim of forfeiture of the contract; on the contrary, it is insisting on the contract itself, and insisting that by its terms it did not insure the deceased when engaged in military services in time of war. To apply the doctrine of estoppel and waiver here would make this contract of insurance cover a loss it never covered by its terms, to create a liability not created by the contract and never assumed by the defendant under the terms of the policy. In other words, by invoking the doctrine of estoppel and waiver it is sought to bring into existence a contract not made by the parties, to create a liability contrary to the express provisions of the contract they did make. * * *

We do not understand that the doctrine of waiver or estoppel goes that far. *After a loss accrues, an insurance company may, by its conduct, waive a forfeiture; or by some act before such loss it may induce the insured to do or not to do some act contrary to the stipulations of the policy, and thereby be estopped from setting up such violation as a forfeiture; but such conduct*, though in conflict with the terms of the contract of insurance and with the knowledge of the insured and relied upon by him, *will not have the effect to broaden out [sic] such contract so as to cover additional objects of insurance or causes of loss.*

*Ruddock*, 177 N.W. at 248 (internal citations omitted) (paragraph breaks added) (emphasis added).

*See, e.g.,* applying *Ruddock* to reject insured's waiver/estoppel argument: *City of Three Rivers*, 290

---

BCBSM. The documentary evidence established that plaintiffs contacted MEBS twice before their daughter was admitted, inquiring about coverage. Plaintiffs were simply told that the policy would not cover the treatment . . . , and the record does not show that MEBS shared any information regarding pre-certification. * * * The provision on out-of-state inpatient care does not provide that there is no coverage for such care; rather, it merely indicates that there must be "Michigan Blue Cross pre-certification prior to admittance." Although plaintiffs were in contact with MEBS, they were not informed of any pre-certification procedure.

* * * [T]his provision does not preclude coverage, but appears to be more in the nature of a condition precedent. For a defendant to complain that plaintiffs failed to satisfy the pre-certification provision is questionable, given that MEBS twice told plaintiffs that there simply was no coverage under the policy and given that MEBS did not mention pre-certification during plaintiffs' inquiries despite the policy language directing parties to contact MEBS about out-of-state inpatient care. *Whether under principles of estoppel or waiver, we conclude that defendant was barred from arguing, after plaintiffs admitted their daughter to the Renfrew Center, that they failed to satisfy the pre-certification requirement. See Kirschner . . . .*

*Id.* (footnote 4 omitted) (emphasis added).

-27-

N.W. 390, 391-92 (Mich. 1940); *Henne v. Glens Falls Ins. Co. of Glens Falls, NY*, 222 N.W. 731

(Mich. 1929); *Wells v. Prudential Ins. Co. of America*, 214 N.W. 308, 309 (Mich. 1927) (citing

*Ruddock* and *Ames v. Auto Owners Ins. Co.*, 195 N.W. 686 (Mich. 1923)).

The Michigan Court of Appeals more recently explained the limited circumstances in which

an insurer may be estopped from invoking a contractual basis for denial of coverage:

> [E]stoppel or waiver has been used in this state to defeat the insurer's claim that the
> insured forfeited his policy for nonpayment of a premium. * * *  Unlike *Ruddock*,
> this is not a case where the jury was being asked to create insurance where none
> existed or to extend the scope of the insurance coverage.  Rather, this is a case
> dealing with:  * * *  the effect of the failure to pay the premium when due . . . .

*Allstate Ins. Co. v. Snarski*, 435 N.W.2d 408, 411-12 (Mich. App. 1988) (discussing *Pastucha v.*

*Roth*, 287 N.W. 355 (Mich. 1939) (citing, *inter alia*, *Jones v. Preferred Bankers' Life Ass. Co.*, 79

N.W. 204 (Mich. 1899))).[11]

---

[11]

*Cf. Arnott v. Binson's Hosp. Supplies, Inc.*, 1996 WL 33364125, *1 (Mich. App. 1996) (T.G.
Kavanagh, former S.Ct. J., by designation, concurring in part & dissenting in part) ("A well
recognized exception to the general rule of estoppel, precludes its application where the result would
be to broaden coverage of the policy beyond its express terms.  *Ruddock* * * * Defendant's reliance
on this exception is mistaken because a finding of liability on the part of defendant will not result
in broadening the coverage of the policy beyond its express terms . . . .");

The Michigan courts distinguish between an insurer trying to forfeit, cancel or discontinue
a policy (estoppel possible) and an insurer merely trying to enforce the policy's substantive coverage
and exclusion terms (estoppel not possible), *see Doeren Mayhew & Co., P.C. v. CPA Mut. Ins. Co.*
*of Am. Risk Retention Group*, 2007 WL 118939 (E.D. Mich. Jan. 10, 2007).  Judge Sean Cox wrote,

> Defendant argues that the SEC proceeding could not constitute a claim under the
> 1999 Policy Form because it did not 'include the service of suit or the institution of
> arbitration proceedings' against Plaintiff.  Plaintiff contends Defendant is precluded
> from raising this as a defense because it was not included in Defendant's reasons for
> denial of coverage. * * *  [B]ecause Defendant is merely asserting the terms of the
> contract, which state that the demand must 'include the service of suit or the
> institution of arbitration proceedings,' the doctrines of estoppel and waiver are
> inapplicable.  Otherwise, as held in *Ruddick* [sic], Defendant could be forced to
> cover a loss not contemplated by the terms of the agreement . . . ."

Nonetheless, some of *Ruddock*'s language can be read as holding, without qualification, that waiver and estoppel can *never* be applied against an insurer if the effect is to require coverage for a loss that was not covered or was subject to an exclusion.  *See Ruddock*, 177 N.W. at 248 (stating unequivocally that conduct that ordinarily would give rise to waiver or estoppel against the insurer "will not have the effect to broaden out [sic] such contract so as to cover additional objects of insurance or causes of loss.").  But a Michigan Supreme Court decision that cites *Ruddock* seems to leave the door open to the application of waiver or estoppel even where that would require the insurer to cover a loss that was expressly excluded by the policy's clear term: "*usually*, the doctrines will not be applied to broaden the coverage of a policy to protect the insured against risks that were not included in the policy or that were expressly excluded from the policy." *Kirschner*, 592 N.W.2d at 709-10 (emphasis added) (citing *Ruddock).*

### *Grosse Pointe Park* (Michigan 2005) Revisits *Ruddock* (Michigan 1920)

After *Kirschner*, an evenly split Michigan Supreme Court revisited the issue in *City of Grosse Pointe Park v. Michigan Munic. Liab. & Prop. Pool*, 702 N.W.2d 106, 117 n.12 (Mich. 2005) ("*GPP*"), over 80 years after *Ruddock*.  Because Justice Maura Corrigan did not participate, the seven-member Court had only six members voting.  The opinion of the Court, delivered by Justice Cavanagh and joined by Justices Weaver & Kelly ("the Cavanagh opinion"), held that the insured failed to establish the elements needed to estop the insurer from invoking a particular exclusion.  Then, in dictum, the Cavanagh opinion went on to say that *if* the insured had established the elements of estoppel, the insurer might be estopped from invoking the exclusion,

---

*Id.* at *3-4.

notwithstanding *Ruddock*'s statement that estoppel can never be used to require (create) coverage which the policy excludes.

First, this court notes the Cavanagh opinion's explanation for its holding:

The city maintains that the pool should be estopped from enforcing the pollution exclusion clause because of the pool's practice of covering basement backup claims before, during, and after the underlying litigation in this case, without ever invoking the pollution exclusion clause. According to the city, the pool's failure to enforce this clause, as well as the manner in which the pool conducted the defense, led the city to believe that the underlying litigation would be covered. The city maintains that were it not for this belief, it would have conducted discovery and settlement negotiations differently. Thus, the city contends that it was prejudiced by its reliance on its belief that coverage would be provided in the underlying suit.

The Court of Appeals . . . conclude[d] that a question of fact remained [as to] whether the pool should be estopped from asserting the pollution exclusion clause. We disagree. Under the facts of this case, a reasonable trier of fact could not conclude that the city satisfied its burden.

In this case, it cannot be said that the city's reliance on the pool's actions or representations was justified. At the beginning of the underlying litigation, the pool notified the city that it would provide a defense in the underlying litigation, "but will *not* pay any damages not covered by our contract. In legal terms, we are reserving our rights to restrict payments to those owed under the coverage contract." The pool timely notified the city that if any judgment was entered against the city for the discharge of pollutants into Fox Creek, the pool was reserving the right to not indemnify, specifically quoting the pollution exclusion clause. We find the pool's reservation of rights particularly damaging to the city's estoppel theory. * * * [W]e fail to see how the city was justified in believing that indemnification would be provided in this particular case.

"When an insurance company undertakes the defense of its insured, it has a duty to give reasonable notice to its insured that it is proceeding under a reservation of rights, or else the insurance company will be estopped from denying its liability." *Kirschner v. Process Design Assoc., Inc.*, . . . 592 N.W.2d 707 ([Mich.] 1999). Here, the pool duly reserved its rights, and the city was aware of the reservation. Accordingly, the city was on notice that the pool might not indemnify it.

Moreover, by the city's own account, the pool had never before reserved its right to contest coverage under the auspices of the pollution exclusion clause. Yet the city claims that it was justified in believing that the pool would indemnify it [after taking the unprecedented step of reserving its right to refuse such coverage]. We believe,

-30-

> however, that these facts, [even] when viewed in the light most favorable to the city,
> weigh against a finding of estoppel.

*GPP*, 702 N.W.2d at 116-117 (J. Cavanagh, joined by JJ. Weaver & Kelly) (last ¶ break added).

The Cavanagh opinion went on to state that *Ruddock* could be read to permit estoppel of an insurer in certain circumstances where the effect *would* be to require coverage contrary to the express terms of the policy:

> We disagree with Justice Young's expansive reading of *Kirschner* [(Mich. 1999)].
> Relying on that decision, Justice Young posits that even if Grosse Pointe Park [the
> insured] could prove all the elements for the application of estoppel, the city would
> still be unprotected because estoppel can never be applied to extend coverage,
> period. In our view, Justice Young misreads *Kirschner*. *Kirschner* does not set forth
> the inflexible rule that Justice Young prefers. Indeed . . . *Kirschner* . . . was careful
> to avoid making sweeping generalizations or extending *Ruddock* . . . beyond its
> intended bounds.
>
> Further, *Kirschner* . . . prudently observed that in some instances, courts have applied
> the doctrine of estoppel to bring within coverage risks not covered by the policy.
> *Kirschner* then provided a few examples – examples that we believe are not
> exhaustive nor could reasonably be inferred to be exhaustive.
>
> Justice Young further laments that we do not give credence to the "prominent
> language" from *Kirschner* that emphasizes that "[t]he application of . . . estoppel is
> limited. *Post* [702 N.W.2d] at 126 n.35, quoting *Kirschner* . . . . We respectfully
> disagree. Rather, we believe that our evenhanded reading of *Kirschner* considers all
> of the opinion's "prominent language." For example, this Court observed that the
> "application of waiver and estoppel is limited, and, *usually*, the doctrines will not be
> applied to broaden the coverages of a policy . . . ." *Kirschner* . . . (emphasis added).

*GPP*, 702 N.W.2d at 117 n.12 (J. Cavanagh for the Court, joined by JJ. Weaver & Kelly).

*Grosse Pointe Park* (Michigan 2005) Lacks Precedential Force

The Cavanagh opinion also made clear, however, that its interpretations of *Kirschner* (Mich. 1999) and *Ruddock* (Mich. 1920) on this issue were dictum:

> In any event, because [GPP]'s estoppel claim fails and the discharges fall under the

purview of the pollution exclusion clause – as Justice Young likewise concludes – it is unnecessary to determine whether estoppel could be used to bring the discharges within coverage.   In other words, because [GPP]'s estoppel claim fails, it is unnecessary to adopt Justice Young's preferred rule, decide whether coverage in this case should be expanded, or depart from this Court's prior precedent.

*GPP*, 702 N.W.2d at 117 n.12 (J. Cavanagh, joined by JJ. Weaver & Kelly).  In Michigan, dictum issued by the lower courts is not binding.  *People v. Althoff*, – N.W.2d –, 2008 WL 4057524 (Mich. App. 2008) ("[D]ictum is not binding on this court . . . .") (citing *Griswold Props., LLC v. Lexington Ins. Co.*, 741 N.W.2d 549, 553 (Mich. App. 2007) ("[S]tatements concerning a principle of law not essential to the determination of the case are obiter dictum and lack the force of an adjudication.") (citing, *inter alia*, *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905 (Mich. 1985))).[12]

It appears that even dictum issued by the Michigan Supreme Court is not binding, where it consists merely of a passing remark or brief cursory discussion.  *See, e.g., Coppola v. Middlebelt Nursing Home, Inc.*, 2006 WL 2089150, *2 (Mich. App. July 27, 2006) (p.c.) (P.J. Hoekstra, JJ. Neff & Owens) ("Hence, the Supreme Court's casual reference to the decedent's date of death as the accrual date of the plaintiff's claim was merely dicta and was not binding.") (citing *Carr v. City of*

---

[12]

Justice Young wrote an opinion concurring in the result, i.e., agreeing that the insurer was not estopped from relying on the policy, but differing as to the rationale.  He was joined by Justices Taylor and Markman, meaning that the Court issued two opinions joined by three Justices each. Justice Young concluded by reinforcing the blanket rule set forth in *Ruddock*, without the two narrow exceptions favored by the other three-Justice opinion.  Justice Young wrote:

> Although this Court is equally divided on the appropriate legal analysis, this Court is unanimous regarding the proper result.  *  *  *
>
> Sewage is clearly a "pollutant" under the plain language of the policy's pollution exclusion clause.  *  *  *  Under *Ruddock* and *Kirschner*, the Pool is not equitably estopped from denying coverage because estoppel will not be applied to broaden coverage beyond the particular risks specifically covered by the policy itself.

*GPP*, 702 N.W. 2d at 118, 119, 127-28 (Young, J., joined by Taylor & Markman, JJ.).

*Lansing*, 674 N.W.2d 168, 172 (Mich. App. 2003)).  Nonetheless, an ancient Michigan Supreme

Court decision, still followed by the Court of Appeals, holds that

> when a court of last resort intentionally takes up, discusses and decides a question germane to, though not necessarily decisive of, the controversy, such decision is not a dictum but is a judicial act of the court which it will therefore recognize as a binding decision.

*Carr*, 674 N.W.2d at 172 (quoting *People v. Higuera*, 625 N.W.2d 444, 449 (Mich. App. 2001)

(quoting *Detroit v. Michigan PUC*, 286 N.W.2d 368, 379 (Mich. 1939)).  To put it another way, "[a]

decision of the Supreme Court is authoritative with regard to any point decided if the Court's

opinion demonstrates '*application of the judicial mind* to the precise question adjudged, regardless

of whether it was necessary to decide the question to decide the case.'" *Higuera*, 625 N.W.2d at 449

(quoting *People v. Bonoite*, 315 N.W.2d 884, 886 (Mich. App. 1982)) (emphasis added).

The Cavanagh opinion in *GPP* certainly demonstrates "application of the judicial mind" to

the interpretation of *Ruddock* (Mich. 1920).[13]  Thus, if the Cavanagh opinion in *GPP* that opinion

had garnered votes from four of the Court's seven members, its detailed, considered treatment of

*Ruddock* would probably be considered authoritative by Michigan's lower courts.

In any event, as noted in *GPP* itself, because the Cavanagh and Young opinions each

garnered only three votes, with no opinion to break the tie, "neither establishes binding precedent."

*GPP*, 702 N.W.2d at 118 n.1 (J. Young, joined by JJ. Taylor & Markman).  "The clear rule in

Michigan is that a majority of the Court must agree on a ground for decision in order to make that

binding precedent for future cases.  If there is merely a majority for a particular result . . . the case

---

[13]

*Contrast* the more cursory statements discussed in *Bonoite*, 315 N.W.2d at 886:  "The [Supreme Court's] *Fountain* opinion contains nothing which indicates a reason for such a departure from prior law.  An application of the 'judicial mind' to the 'simultaneous filing' language is thus not apparent and we agree with the *Ruff* panel that the language may be disregarded as dicta."

is not authority beyond the immediate parties." *People v. Anderson*, 205 N.W.2d 461, 466 (Mich. 1973) (citing, *inter alia*, *Kalamazoo v. Crawford*, 117 N.W. 572 (Mich. 1908)), *overruled in part o.g. by People v. Hickman*, 684 N.W.2d 267 (Mich. 2004).  This is a venerable proposition in Michigan.  *See People v. Regents of Univ. of Michigan*, 18 Mich. 469, 1869 WL 3613, *8 (Mich. May 13, 1869) ("[W]e are disappointed by an equal division of opinion among the members of the Court.  [T]his circumstance would deprive our opinion of all force as judicial authority . . . .").

Accordingly, *GPP* is of limited assistance in predicting whether the Michigan Supreme Court would permit waiver or estoppel against an insurer to require coverage for an excluded item.  This court must rely on that Court's most-recent precedential statement on the subject, *Kirschner* (Mich. 1999), and on published decisions of the Court of Appeals.[14]

### *Smit* (Mich. App. 1995) and *Lee* (Mich. App. 1986) Explain When Post-*Ruddock* Cases Have Permitted Waiver/Estoppel to Require Coverage for an Excluded Loss

In  *Smit v. State Farm Mut. Auto. Ins. Co.*, 525 N.W.2d 528 (Mich. App. 1995) (P.J. Reilly, J. Taylor, and 14th Cir. J. Michael Kobza by designation), the Court of Appeals remarked,

> The limitation on the application of waiver and estoppel discussed in *Ruddock* has not been applied without exception.  In *Lee*, this Court identified two classes of cases decided since *Ruddock* in which estoppel or waiver was applied to bring within coverage risks not covered by policy terms or expressly excluded from the policy:
>
>> The first class involves companies which have rejected claims of coverage and declined to defend their insureds in the underlying

---

14

The Michigan Supreme Court has the same seven members today as when it issued *GPP* in 2005.  Absent evidence to the contrary, this court assumes that the six Justices who participated in *GPP* adhere to their views stated there.  Had Justice Corrigan participated in *GPP*, she could have broken the tie by joining the Cavanagh or Young opinion.  Accordingly, this court tried to ascertain how Justice Corrigan would likely vote on the insurer-estoppel issue.  Unfortunately, since *GPP*, the Michigan Supreme Court has not cited *Ruddock* (Mich. 1920) or *Kirschner* (Mich. 1999) again.

litigation.  In these instances, the Court has held that the insurance company cannot later raise issues that were or should have been raised in the underlying litigation.  *Morrill v. Gallagher*, . . . 122 N.W.2d 687 ([Mich.] 1963); *Dickenson [Dickinson] v. Homerich*, . . . 227 N.W. 696 ([Mich.] 1929).  These cases are closely akin to the principle behind collateral estoppel.

The second class of cases allowing the limits of a policy to be expanded by estoppel or waiver despite the holding of *Ruddock* involves instances where the inequity of forcing the insurer to pay on a risk for which it never collected premiums is outweighed by the inequity suffered by the insured because of the insurance company's actions. [The insurance company has either misrepresented the terms of the policy to the insured, *see Industro Motive Corp. v. Morris Agency, Inc.*, 256 N.W.2d 607 ([Mich. App.] 1977), and *Parmet Homes, Inc. v. Republic Ins. Co.*, 314 N.W.2d 453 ([Mich. App.] 1981) . . . , or defended the insured without reserving the right to deny coverage.]

*Smit*, 525 N.W.2d at 531 and 532 (quoting *Lee v. Evergreen Regency Coop. & Mgmt. Sys., Inc.*, 390 N.W.2d 183, 186 (Mich. App. 1986)).

Carey's situation does not fall within either of the putative exceptions to the *Ruddock* rule that were recognized by the Michigan Court of Appeals in *Lee* and *Smits*.

To fall within the first exception to *Ruddock*, Carey would have to show that Amerisure "'rejected claims of coverage and declined to defend their insured[] in the underlying litigation.'" *Smit*, 525 N.W.2d at 531 (quoting *Lee*, 390 N.W.2d at 186).  This exception does not apply, because while Amerisure arguably rejected Carey's claim for coverage in its March and November 2006 letters, it did ultimately agree to defend Carey in the underlying action (in its November 2006 letter).

As noted above, Amerisure first learned of the underlying action on February 15, 2006, when it received a copy of the complaint from Great West,[15] and it sent its first reservation-of-rights letter

---

[15]

*See* Amerisure's Opp to Carey's MSJ, Ex A at 1 (Letter of Feb. 15, 2006 from Great West counsel Aaron D. Wisely, Esq., to Amerisure's Senior Claims Adjuster James Siatczynski).

to Carey about five weeks later, on March 22, 2006.  Amerisure's letter read, in pertinent part,

Because information available to us at this point is limited, we will proceed to investigate this claim subject to a full reservation of all of our rights and defenses.

Amerisure's conduct in handling this matter is subject to all of the terms, provisions and conditions of its policy.  *Your attention is specifically drawn to the following, which precludes coverage of this claim.*

\* \* \*

[Page 3] **B.  Exclusions**

*This insurance does not apply to any of the following:*

***6.  Care, Custody Or Control***
"Property damage" to or "covered pollution cost or expense" involving property owned or transported by the "insured" or in the "insured's" care, custody or control.  But this exclusion does not apply to liability assumed under a sidetrack agreement.

\* \* \*

[Page 4] **\* \* \* The Plaintiff [Great West]'s complaint alleges that the trailer owned by February Fourteen, Inc. [FFI] and its cargo was under the care, custody and control of Carey Transportation, Inc.  Similarly, our investigation also has shown that the trailer and cargo were in Carey Transportation, Inc.'s care, custody and control.  Therefore because of the above cited exclusion, there may not be coverage for this loss.**

**We will complete our coverage review process[,] and should it be determined that the Amerisure policy provides coverage on any part or all of this complaint, Carey Transportation, Inc. will be reimbursed for any legal costs that are reasonable and necessary.**

Amerisure's Opp to Carey's MSJ, Ex C (Letter of Mar. 22, 2006 from Amerisure counsel to Carey) at 1-5 (boldface in original, italics added).

To fall within the second exception to *Ruddock*, Carey would have to show that "the inequity of forcing [Amerisure] to pay on a risk for which it never collected premiums is outweighed by the inequity suffered by the insured because of the insurance company's actions," *Lee*, 390 N.W.2d at 186.  Carey has not done so.

Carey has not shown that she relied to its detriment on Amerisure's written statement

invoking one exclusion (Exclusion 6), but not the other (Exclusion 2), in the first reservation-of-rights letter, March 2006.  As soon as Amerisure added Exclusion 6 to its warning about likely denial of coverage – in the second reservation-of-rights letter, November 2006 – it also assumed Carey's defense.  If the exclusion that was not invoked until the second letter (Exclusion 2) turns out to exclude coverage, Carey is no worse off than it was when coverage was initially denied.  As the Michigan Court of Appeals reasoned in a similar case,

> We conclude that Senneker was not prejudiced by State Farm's belated assertion of a different provision purportedly excluding coverage.  This case is distinguishable from *Industro Motive Corp. v. Morris Agency, Inc.*, 256 N.W.2d 607 ([Mich. App.] 1977), where the plaintiff, before a loss, acted in reliance on misrepresentations concerning the terms of a policy.  In this case, *if the exclusion is applicable to the loss, Senneker is in no worse position than she was when coverage was initially denied.*  Unlike the plaintiff in *Industro Motive*, *Senneker did not rely on the statements of the insurer to her detriment.*

*Smits*, 525 N.W.2d at 532 (emphasis added) (citation to state reporter omitted).

There is no allegation that Amerisure made misrepresentations to Carey about the policy's terms, let alone that it made such a misrepresentation before Carey's May 2005 loss and that Carey relied on it.  *Cf. So. Macomb Disposal Auth. v. Am. Ins. Co.*, 572 N.W.2d 686 (Mich. App. 1997) (J. Corrigan, joined by J. Warshawsky; J. Jansen concurring in pertinent part & dissenting o.g.):

> Exceptions to the general [*Ruddock*] rule have been made in cases within two broad classes:
>
> * * *
>
> *Id.* at 286-87.  [*Lee v. Evergreen Regency Coop. & Mgmt. Sys., Inc.*, 390 N.W.2d 183, 186 (Mich. App. 1986)]
>
> The trial court, in finding that the pollution exclusion clause may be perceived as deceptive, apparently concluded that the instant case falls within the second class.  The evidence, however, does not reflect that Westchester misrepresented the terms of the policy to Plaintiff.  Westchester denied coverage to plaintiff on the basis of the pollution exclusion; thus, the doctrine of waiver and estoppel should not be used to require Westchester to cover any loss that falls within the pollution exclusion.

> The trial court erred in finding that factual questions arose regarding waiver and estoppel because: (1) the pollution exclusion is unambiguous, (2) no evidence demonstrated that Westchester misled plaintiff as to the policy's terms, and (3) Westchester specifically denied coverage to plaintiff based on the pollution exclusions contained in its policies.

*Id.* at 713 (final ¶ break added); *see also Hakeem v. Lumbermen's Mut. Ins. Co.*, 2005 WL 3237852, *1 (Mich. App. Dec. 1, 2005) (p.c.) (P.J. Smolenski, JJ. Schuette & Borrello) ("No reasonable view of the evidence would support a determination that defendant intentionally or negligently induced plaintiff to believe that it would not rely on the policy exclusion at issue. Rather, defendant in its initial letter to plaintiff's counsel expressly stated that it was not waiving any of its rights under the policy. * * * Thus, the trial court did not err in rejecting plaintiff's equitable estoppel argument").

Nor has Carey shown that Amerisure "defended the insured [Carey] without reserving the right to deny coverage", *Lee*, 390 N.W.2d at 186, because the very November 2006 letter in which Amerisure assumed the defense again emphatically reserved its right to deny coverage. Therefore, the second *Smits-Lee* exception to *Ruddock* is of no avail to Carey.

Consequently, even assuming *arguendo* that the Michigan Supreme Court would recognize the *Smits-Lee* exceptions to *Ruddock*'s general rule, those exceptions do not apply on our facts. The case remains governed by *Ruddock*'s general rule that waiver or estoppel will not be permitted against an insured where doing so would require the insurer to pay damages for which coverage was either not-provided or expressly-excluded. Accordingly, on this record, Carey has not provided the court with any firm basis for predicting that the Michigan Supreme Court would hold that Amerisure waived or is estopped from invoking Exclusion 2 or Exclusion 6.

The court now considers whether either of those policy exclusions applies.

### EXCLUSION 2 DOES NOT APPLY, BECAUSE EXCEPTION B APPLIES.

The Amerisure-Carey policy's Section B, entitled Exclusions, provides that

This insurance does not apply to any of the following:
* * *
2.      Contractual
Liability assumed under any contract or agreement.  But this exclusion does not apply to liability for damages:

       a. Assumed in a contract or agreement that is an "insured contract" provided that the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

       b. That the "insured" would have in the absence of the contract or agreement.

Amerisure's MSJ Ex B.

The insurer, Amerisure, contends that Exclusion 2 applies because Carey entered into a contract wherein Carey assumed liability for the type of loss sustained here.  Amerisure is apparently referring to a Broker/Carrier Agreement executed May 6, 2005 between transporter Carey and customer FFI.  The Broker/Carrier Agreement provides, in pertinent part,

      6. **INDEMNITY**  CARRIER [Carey] shall defend, indemnify and hold harmless BROKER [FFI] from and against all loss, damage, expense, cost, injury to persons (including death) and for damage to property arising out of or in connection to CARRIER['S] failure to comply with the terms of this agreement or CARRIER'S loading, handling, transportation, unloading or delivery of any shipments made hereunder.
* * *
      8. **FREIGHT LOSS, DAMAGE OR DELAY**   BROKER [FFI] shall submit to CARRIER [Carey] written notice of any cargo claim, including loss or expense resulting from CARRIER'S delay in providing service, upon delivery of this shipment, or if no delivery, the date of the occurrence resulting in this claim.  The filing process and disposition of all cargo claims shall be governed by 49 C.F.R.

      CARRIER [Carey] shall be liable to BROKER [FFI] for cargo claims incurring [sic] while in the possession or under the control of CARRIER, relating to or arising out of CARRIER'S neglect [sic] performance of or failure to properly perform the transportation services provided for in this agreement.  Neither BROKER nor

> CARRIER shall be liable to the other for any loss, damage, delay or failure to perform caused by acts of God, public enemy, inherent nature of the cargo, wars, strikes, *fires*, or floods.
>
> CARRIER [Carey] shall be liable to BROKER [FFI] for all economic loss, including subsequential [sic] damages that are incurred by BROKER or BROKER'S customers for any goods of BROKER'S customer in the possession or control of CARRIER.

Amerisure MSJ, Ex H at 1-2 (capitalization, underlining, and boldface in original) (paragraph breaks added to Broker/Carrier Agreement ¶ 8).

The insured, Carey, argues that its Broker/Carrier Agreement with FFI cannot trigger Exclusion 2, because that agreement was not signed until after the accident. *See* Carey's MSJ at 4. Carey's argument fails, however, because nowhere does the policy limit the exclusion to cases where the insured entered the liability-assuming contract before the occurrence of the accident or loss. The policy plainly states, without limitation, that Exclusion 2 applies to "Liability assumed [by the insured] under any contract or agreement."

We know that when Amerisure wished to specify that only a *post-loss* contract by the insured triggers a certain provision, it knew how to do so and did so explicitly[16]: Exclusion 2's Exception "a" states that the exclusion does not apply to liability for damages "[a]ssumed in a contract or agreement that is an 'insured contract' *provided that the 'bodily injury' or 'property damage' occurs subsequent to the execution of the contract* or agreement." Emphasis added. The parties did not

---

16

*Cf. First American Title Co. v. Devaugh*, 480 F.3d 438, 452-53 (6th Cir. 2007) (Richard Allen Griffin, J.) ("The existence of M.C.L. § 15.443 (d) shows that, when the Legislature wished to authorize a public body to impose a no-resale condition to the provision of public record copies, the Legislature knew how to do so and did so explicitly.") (citing *Marx v. Centran Corp.*, 747 F.2d 1536, 1545 (6th Cir. 1984) (after noting that 12 U.S.C. § 93(a) contained an express cause of action and § 93(b) did not, the court remarked, "[t]his difference between the two subsections leads to the conclusion that 'when Congress wishes to provide a private damages remedy, it knew how to do so and did so expressly.'") (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 572 (1979))), *reh'g & reh'g en banc denied* (6th Cir. July 12, 2007).

insert any such limitation on the application of Exclusion 2 itself, and the court lacks authority to read such a limitation into the body of the exclusion. *See Cottrill v. Mich. Hosp. Serv.*, 102 N.W.2d 179, 182 (Mich. 1960) ("Plaintiff's right of recovery rests on the contract as written. Under the guise of interpretation it may not be reformed or modified.") (citing *Lombardi v. Metro. Life Ins. Co.*, 260 N.W. 160 (Mich. 1935)).[17]

Accordingly, Exclusion 2 will apply unless one of the Exceptions (a or b) applies.

### EXCLUSION 2'S EXCEPTION A

The court need not decide whether Exception "a" applies, because Exception "b" applies. That is enough to render Exclusion 2 inapplicable.

### EXCLUSION 2'S EXCEPTION B

As noted above, the policy provides that Exclusion 2 (damages for which Carey assumed liability by contract or agreement) "does not apply to liability for damages: * * *  b.  That the 'insured' would have in the absence of the contract or agreement."

Great West persuasively contends that if Carey is liable for the damages sought in the

---

[17]

    *See, e.g., City of Ferndale v. Florence Cement Co.*, 2008 WL 2697729, *4 (Mich. App. July 10, 2008) (p.c.) (P.J. Owens, JJ. O'Connell & Davis) ("[T]he trial court erred in reading a 'commercially reasonable' standard into the contract. There is no provision that expressly limits the engineer's authority under paragraph 13.11 to repairs which are 'commercially reasonable', and courts may not read into an agreement terms that have not been placed there by the parties.") (citing *Cottrill* and *Trimble v. Metro. Life Ins. Co.*, 9 N.W.2d 49 (Mich. 1943));

    *Michigan Twp. Participating Plan v. Fed. Ins. Co.*, 592 N.W.2d 760, 765 (Mich. App. 1999) (retired Mich. S.Ct. J. Robert P. Griffin, by desig.) ("[T]he learned trial court erred in reading into the reinsurance contract . . . a 'follow the fortunes' clause that was not agreed to by the parties.").

underlying action – stayed pending resolution of this action – the liability will arise at common law and under federal statute and regulations, i.e., that Carey would be liable to Great West "in the absence of the [belatedly signed Broker/Carrier] contract or agreement [or the alleged earlier Broker/Carrier contract between Broker FFI and Carrier Carey]."

Count one of Great West's complaint in the underlying action is denominated as a negligence / breach of contract claim.  It alleges that Michigan common law and federal Motor Carrier Safety regulations imposed duties on Carey to provide well-maintained equipment while transporting FFI's equipment and cargo, that Carey breached those duties, and that Carey is liable even if there is no valid Carey-FFI Broker/Carrier agreement.  *See* Great West Comp in No. 1:2006-cv-106, ¶¶ 18-20.  The court determines that Great West's negligence claim seeks to impose "liability for damages" which Carey would have in the absence of a contract or agreement.  *See Church Mut. Ins. Co. v. Consumers Energy Co.*, 2008 WL 53773, *8 (W.D. Mich. Jan. 2, 2008) (Quist, J.) ("Church's negligence claim is based on a legal duty in tort independent of any possible breach of contract.  At a minimum, [the insured] Consumers had a duty to exercise reasonable care in maintaining their wires.  * * * [T]he 'duty exists in law in the absence of a contract.'") (quoting *Michigan Basic Prop. Ins. Ass'n v. Detroit Edison Co.*, 618 N.W.2d 32, 38 (Mich. App. 2000)).

Count two of Great West's complaint in the underlying action seeks damages under the Carmack Amendment, 49 U.S.C. § 14706[18], which Great West characterizes as a strict-liability

---

[18]

Title 49 U.S.C. § 14706(a), entitled General Liability, provides:

(1) Motor carriers and freight forwarders. – A carrier providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 shall issue a receipt or bill of lading for property it receives for transportation under this part.  That carrier and any other carrier that delivers the property and is providing transportation or service subject to jurisdiction under subchapter I or III of chapter

statute "which operates as a matter of law and cannot be enlarged, restricted, or otherwise altered

---

> 135 or chapter 105 are liable to the person entitled to recover under the receipt or bill of lading.
>
> The liability imposed under this paragraph is for the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, (C) another carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading and, except in the case of a freight forwarder, applies to property reconsigned or diverted under a tariff under § 13702.
>
> Failure to issue a receipt or bill of lading does not affect the liability of a carrier. A delivering carrier is deemed to be the carrier performing the line-haul transportation nearest the destination but does not include a carrier providing only a switching service at the destination.
>
> (2) Freight forwarder. – A freight forwarder is both the receiving and delivering carrier. When a freight forwarder provides service and uses a motor carrier providing transportation subject to jurisdiction under subchapter I of section 135 to receive property from a consignor, the motor carrier may execute the bill of lading or shipping receipt for the freight forwarder with its consent.
>
> With the consent of the freight forwarder, a motor carrier may deliver property for a freight forwarder on the freight forwarder's bill of lading, freight bill, or shipping receipt to the consignee named in it, and receipt for the property may be made on the freight forwarder's delivery receipt.

49 U.S.C. § 14706(a). Subsection (b), entitled Apportionment, provides, in its entirety:

> The carrier issuing the receipt or bill of lading under subsection (a) of this section or delivering the property for which the receipt or bill of lading was issued is entitled to recover from the carrier over whose line or route the loss or injury occurred the amount required to be paid to the owners of the property, as evidenced by a receipt, judgment, or transcript, and the amount of its expenses reasonably incurred in defending a civil action brought by that person.

49 U.S.C. § 14706(b).

Section 14706(f) was amended effective August 11, 2005, but that was *after* the loss here, *see* Pub. L. No. 109-59, Title IV, § 4207, 119 Stat. 1757, and it would not affect the analysis anyway.

pursuant to the terms of any contract which may be in existence." In other words, Great West contends that any liability by Carey on count two of the underlying action will be liability that would be imposed "in the absence of [any] contract or agreement [between Broker FFI and Carrier Carey]."

In line with our sister circuits, the court agrees that "Carmack 'imposes something close to strict liability upon originating and delivering carriers.'" *Sompo Japan Ins. Co. of Am. v. Union Pac. R. Co.*, 456 F.3d 54, 59 (2d Cir. 2006) (quoting *Rankin v. Allstate Ins. Co.*, 336 F.3d 8, 9 (1st Cir. 2003)). "Indeed, Carmack effectively codified the strict liability that governed the liability of common carriers at common law." *Sompo*, 456 F.3d at 59 (citing *Mo. Pac. R.R. Co. v. Elmore Stahl*, 377 U.S. 134, 137 (1964)).[19] The court determines that by suing Carey under the Carmack Amendment, Great West sought to impose strict liability, which is the quintessential "liability for damages" that exists without regard to the existence or terms of any contract or agreement.

For these reasons, Exception "b" to Exclusion 2 applies, which means that Exclusion 2 does not apply. Consequently, Carey is entitled to coverage unless Amerisure can show that Exclusion 6 applies (damage to property owned by, being transported by, or in the care, custody, or control of the insured).

---

[19]

*Accord Schoenmann Produce Co. v. Burlington No. & Santa Fe Ry. Co.*, 420 F. Supp.2d 757, 760 (S.D. Tex. 2006) (referring to "the Carmack Amendment's strict liability provisions");

*Bullocks Express Transp., Inc. v. XL Specialty Ins. Co.*, 329 F. Supp.2d 1246, 1254 (D. Utah 2004) (referring to "[t]he strict liability of carriers under the Carmack Amendment");

*M.R. Swanson, Inc. v. Burlington No. & Santa Fe Ry. Co.*, 2001 WL 201378, *3 (E.D. Cal. Feb. 21, 2001) (referring to "the Carmack Amendment's strict liability provisions");

*Medtronic v. Roadway Express, Inc.*, 1999 WL 33444159, *6 n.4 (C.D. Cal. Dec. 2, 1999) ("The Carmack Amendment is a strict liability statute.") (citing, *inter alia*, *Indep. Machinery, Inc. v. Kuehne & Nagel, Inc.*, 867 F. Supp.2d 752, 758 (N.D. Ill. 1994)).

## DOES EXCLUSION B6 APPLY?

Exclusion 6 provides that

[t]his insurance does not apply to any of the following: * * *  "Property damage" to or "covered pollution cost or expense" involving property owned or transported by the "'insured" or in the "insured's" care, custody or control.  But this exclusion does not apply to liability assumed under a sidetrack agreement.[20]

The court must resolve three issues with regard to Exclusion 6:

(1)  Is the "care, custody or control" clause void as against Michigan or federal public policy?  No.  There is no basis for predicting that the Michigan Supreme Court would so hold.

Great West asserts that the "care, custody or control" exclusion is "ambiguous and otherwise against public policy, and, therefore, Amerisure cannot rely upon this exclusion."  Great West's Opp

---

[20]

The parties have not suggested that Carey assumed liability for any of the damages via a sidetrack provision.  The court could not locate a defining "sidetrack agreement", but for an example of such an agreement, *see, e.g., Schiller v. Penn Central Transp. Co.*, 509 F.2d 263 (6th Cir. 1975):

A sidetrack agreement . . . contained the following provision:

Except as herein otherwise specifically provided, in respect of all loss of or damage to property, or in respect of injury to or death of persons caused by or in connection with the construction, operation, maintenance, use, presence or removal of said track (a) the Railroad shall assume responsibility for and hold the Industry harmless from all losses, damages, claims and judgments arising from or growing out of the sole actionable acts or omissions[,] including Negligence[,] of the Railroad . . . ; (b) the parties hereto shall equally bear all losses, damages, claims and judgments arising from or growing out of the joint or concurring actionable acts or omissions including negligence of both parties hereto . . . ; and (c) the Industry shall assume the responsibility for and save the Railroad harmless from all losses, damages, claims and judgments arising from or growing out of the sole actionable acts or omissions[,] including Negligence[,] of the Industry . . . .

*Id.* at 265.

-45-

to Amerisure's MSJ at 9.  Great West urges the court to declare the exclusion to violate Michigan

and federal public policy for the following reasons:

> *Arrigo's* . . . noted that, if the exclusionary clause upon which Amerisure is
> attempting to rely is read and applied as broadly and literally as Amerisure would
> have this Court believe, this may be a violation of MCLA 500.2005, making it an
> unfair or deceptive trade practice . . . to misrepresent the terms, benefits, advantages,
> or conditions of an insurance policy.  *Id.* at 488, footnote 7 [*Arrigo's Fleet Serv., Inc.
> v Aetna Life & Cas. Co.*, 221 N.W.2d 206, 210 n.7 (Mich. App. 1974)].

> If . . . Amerisure's exclusionary clause is read to exclude coverage for this type of
> loss, it would go against the public policy and purpose of the Carmack
> Amendment[,] which is to protect shippers, and make carriers (such as Carey) liable
> for damage to property transported by them, without extensive inquiry into how the
> property was damaged.  *Taft Equipment Sales Company v. Ace Transportation
> Company, Inc.*, 851 F Supp 1208, 1211 (N.W. Ill. [sic]); citing 49 USCA §
> 11707(a)(1).

> In other words, if Amerisure is to rely on its policy exclusion, Amerisure essentially
> issued a general liability policy to an interstate motor carrier, which excludes from
> coverage those claims that arise directly out of the motor carriers requiring insurance
> in the first place.  This would lead to an absurd result which is clearly violative of
> public policy.

Great West's Opp to Amerisure's MSJ at 11-12 (paragraph breaks added).

The court rejects this assertion because Great West fails to present *any* Michigan decisions

– let alone a published appellate decision – holding that a "care, custody or control" clause identical

or similar to this would violate state public policy, or federal public policy as evidenced by the

Carmack Amendment.  Sitting in diversity, this court's obligation is not to rule as it might on a clean

slate, but to predict how the Michigan Supreme Court would rule.  *Cf. Zettle v. Handy Mfg. Co.*, 998

F.2d 358, 361 (6th Cir. 1993) ("Again, we do not write on a clean slate; the Michigan Supreme Court

has addressed the issue.").

As to Great West's state-public-policy argument, Great West neglects to mention that

*Arrigo's Fleet Serv., Inc. v Aetna Life & Cas. Co.*, 221 N.W.2d 206 (Mich. App. 1974) manifestly

did <u>not</u> hold that enforcement of such a "care, custody or control" exclusion violates Michigan

public policy.  The language of the footnote in question makes clear that it is mere dictum:

> *Were it not that so many courts, including this Court*, notwithstanding their determinations as to the applicability of the clause to the factual contexts of the particular cases, *have implicitly assumed the validity of the clause, we would be inclined to find this clause void on the basis of public policy.*  We would find it to be in disfavor.
>
> Further, we note that the burden should be on insurance agents and companies to explain, with specific examples, what is covered and what is not covered.  *While not brought up by this case*, we feel that the lack of complete explanation, leaving the implication of full coverage could be found to be against the spirit of M.C.L.A. s 500.2005; M.S.A. s 24.12005.  * * *

*Arrigo's*, 221 N.W.2d at 212 n.7.  In Michigan, the dictum of a court below the Supreme Court has

no precedential force.  *See Carr*, 674 N.W.2d at 172 (quoting *Higuera*, 625 N.W.2d at 449) (quoting

*Detroit v. MPUC*, 286 N.W.2d 368, 379 (Mich. 1939))).

Nor did *Arrigo's* hold that such an exclusion is inconsistent with the *letter* of any Michigan

statute regulation.  What *Arrigo's* said is that under circumstances not raised there, enforcement of

such an exclusion could be found to be "against *the spirit*" of a Michigan statute and regulation.

Great West and Carey have not identified any Michigan decisions holding that enforcement of a

broad "care, custody or control of the insured" exclusion would violate Michigan public policy.

As to Great West's federal public-policy argument, as a matter of law it lacks merit.

Assuming *arguendo* that, as Great West states, the purpose of the Carmack Amendment is to

"protect shippers, and make carriers (such as Carey) liable for damage to property transported by

them, without extensive inquiry into how the property was damaged", it is not apparent how

enforcement of Amerisure's care, custody or control exclusion would undermine that purpose.

*Carey would still be liable to the shipper (FFI) and the shipper's carrier (Great West)* "without

extensive inquiry", in the underlying action, "into how the property was damaged".  The application of Exclusion 6 merely means that Carey is not entitled to indemnification from Amerisure for any damages it pays on the Carmack Amendment claim which are subject to the exclusion.

The second inquiry in the court's Exclusion 6 analysis is this:  Is the "care, custody or control" clause so ambiguous that it cannot be enforced, or at least ambiguous so that its intended meaning must be ascertained by the jury as a question of fact based on extrinsic evidence of meaning and intent?  No, the clause is not ambiguous.

In *Arrigo's*, the Michigan Court of Appeals confronted a provision that excluded coverage for "property damage to * * * *property in the care, custody or control of* or being transported by *the Insured* or property as to which the Insured is for any purpose exercising physical control." *Arrigo's*, 221 N.W.2d at 208 (emphasis added).  The insured contended that the only care, custody or control it had was over the trailer itself, not over the contents within the trailer (the cargo). *Arrigo's*, 221 N.W.2d at 208-09.  The insurer responded that coverage was excluded because the cargo was under the physical control of the insured.  *Arrigo's*, 221 N.W.2d at 209.  The trial court ruled that the issue was one for the court, not the jury, as there were no disputed material facts and the exclusion was not ambiguous.  *Id.* (noting that trial court relied on *Appicelli Sales & Serv., Inc. v. Citizens Mut. Ins. Co.*, 199 N.W.2d 242 (Mich. App. 1972)).

The Michigan Court of Appeals reversed and remanded "for further proceedings", *Arrigo's*, 221 N.W.2d at 214.[21]  The Court of Appeals held that

the clause is ambiguous.  In support, we point out that many different courts, in

---

[21]

Presumably the trial court, on remand, was to have a jury determine whether the damaged property was within Arrigo's' care, custody or control as determined by the Supreme Court's criteria.  But *Arrigo's* does not clearly say what the trial court was supposed to do on remand.

-48-

interpreting the clause, have applied many different tests and come to many different conclusions, and have seemingly always based their determinations on an interpretation of the facts of the particular case.

*Arrigo's*, 221 N.W.2d at 212. But the panel went on to clarify the law in this area by "set[ting] out certain guidelines by which these cases may be judged in the future." *Arrigo's*, 221 N.W.2d at 212. The panel adopted as "useful" the following rather detailed principles:

> (1) Where the Property damaged is merely incidental to the property upon which the work is being performed by the insured, the damaged property is not considered as in the *possessory control* of the insured, and a clause excluding from liability damage to property "in the care, custody, or control of the insured" will not operate to exclude the insurer from liability under the policy.

> (2) Where, however, the Property damaged is under the immediate supervision of the insured and is a necessary element of the work involved, the damaged property is considered as in the *possessory control* of the insured, and the exclusionary clause will effectively operate to exclude the insurer from liability under the policy.

> (3) A third principle seems a permissible conclusion from the other two rules: Where the property damaged is in the *proprietary control* of the insured, whether a necessary element of the work involved or merely incidental thereto, the exclusionary clause will operate to exclude the insurer from liability under the policy.

*Arrigo's*, 221 N.W.2d at 212-13 (emphasis added) (quoting 62 A.L.R.2d 1242, 1247-48). *Arrigo's* adopted the BLACK'S LAW DICTIONARY definition of proprietary as "Belonging to ownership; belonging or pertaining to a proprietor; relating to a certain owner or proprietor" and WEBSTER'S THIRD INTERNAT'L DICTIONARY'S then-definition of proprietary as "held as the property of a private owner . . . characteristic of or appropriate to an owner[;] . . . ." *Arrigo's*, 221 N.W.2d at 213 n.12.

Thanks to the very guidance provided by *Arrigo's*, which remains good law, it cannot be said that a "care, custody or control of the insured" clause is so ambiguous as to be unenforceable, or even so ambiguous as to require submission to a jury to determine what the parties meant.

The third inquiry in the court's Exclusion 6 analysis is whether Carey is right that the

exclusion "swallows" all possible coverage, rendering Amerisure's promise of coverage nugatory or illusory.  If so, the exclusion would not be enforceable.  Specifically, noting that Exclusion 6 negates coverage for property damage to property that was in the care, custody or control of the insured, Carey notes that this is a commercial trucking policy, which necessarily contemplates that the insured will attach trailers to its tractors in order to ply its trade.  Carey effectively asks, "for trucking companies whose tractors pull an attached trailer, when would the trailer ever *not* be in the 'care, custody or control' of the insured's employee who is driving the tractor to which the trailer is attached?"  In other words, when would Exclusion 6 not apply, so as to permit any coverage at all?  If Exclusion 6 would always apply, Carey reasons, then it paid premiums in exchange for Amerisure's empty promise to provide coverage (which will always be excluded by exclusion 6).  The court determines, however, that Carey has not shown that Exclusion 6 negates all possible coverage under the policy.

An illusory promise is one where the promisor is "not obligated to do anything in consideration of" the other party's promise or performance.  *J&B Sausage Co. v. Dep't of Mgmt. & Budget*, 2007 WL 28409, *3 n.1 (Mich. App. Jan. 4, 2007) (citing RESTATEMENT SECOND OF CONTRACTS § 77, comment a, page 195 ("Illusory promises.  Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise.")).  *See also Mastaw v. Naiukow*, 306 N.W.2d 378, 380 (Mich. App. 1981) ("the meaning of" an illusory promise is that the promisor's "future conduct is to be in accordance with his own future will, just as it would have been, had he said nothing at all.") (quoting CORBIN ON CONTRACTS (one-vol. ed.) § 16, p.24).

With an illusory promise, a purported contract will lack the necessary mutual obligation, *Hess v. Cannon Twp.*, 696 N.W.2d 742, 748 (Mich. App. 2005) (to be enforceable, a contract must

have competent parties, a legal subject matter, consideration, mutual agreement and mutual obligation) (citing *Thomas v. Leja*, 468 N.W.2d 58, 60 (Mich. App. 1991) (citing *Detroit Trust Co. v. Struggles*, 286 N.W. 844 (Mich. 1939))).  By the same token, Amerisure will not have tendered any consideration for Carey's premium.  *See Bero Motors, Inc. v. GMC*, 2006 WL 2312182, *3 (Mich. App. Aug. 10, 2006) ("A binding contract requires consideration, i.e., a bargained-for exchange. * * * 'There must be a benefit on one side, or a detriment suffered, or service done on the other.'") (quoting *GMC v. Dep't of Treasury*, 644 N.W.2d 734, 738 (Mich. 2002) (quoting *Plastray Corp. v. Cole*, 37 N.W.2d 162, 165 (Mich. 1949) (citing *Sanford v. Huxford*, 32 Mich. 313, 1875 WL 3702 (Mich. 1875))), *app. denied*, 743 N.W.2d 886, *recon. denied*, 747 N.W.2d 258 (Mich. 2008).

Amerisure's promise to provide coverage, however, is not illusory.  For Carey's sake, the court assumes *arguendo* that Exclusion 6 would *always* negate coverage for property damage to Carey's own tractor (because it is property "owned by" the insured); property damage to the attached trailer, even though not owned by Carey (because it was being "transported by" the insured); and property damage to the cargo, even though not owned by Carey (both because it was being "transported by" the insured, and because it was, as this court today holds, within the "care, custody or control" of the insured under the *Arrigo's* standard).  But Exclusion 6 does not purport to negate coverage for property damage to property that was <u>neither</u> owned, transported by, or in the care, custody or control of the insured – such as a stranger's vehicle which Carey's tractor/trailer damages in a collision: the tractor/trailer is still a covered vehicle for the purpose of such damages.  Therefore, some coverage is still possible, depending on the circumstances, despite the presence and broad language of Exclusion 6.

Carey may feel that it did not receive much coverage in return for its premium, but Michigan "'courts do not generally inquire into the *sufficiency* of consideration', so as a consequence even '[a] cent or a pepper corn, in legal estimation, would constitute a valuable consideration.'"  *Marino v. Greyhaven Estates Ltd., LLC*, 2007 WL 2891599, *3 n.6 (Mich. App. Oct. 4, 2007) (quoting *GMC v. Dep't of Treasury*, 644 N.W.2d 734 (Mich. 2002) (citing, *inter alia*, *Harris v. Chain Store Realty Bond & Mtg. Corp.*, 45 N.W.2d 5, 9 (Mich. 1950))).

The fourth and final inquiry in the court's Exclusion 6 analysis is this:  if the clause is not ambiguous and does not render coverage illusory, does it apply to eliminate coverage for some or all of the damages sought by Great West in the underlying action?  Yes, Exclusion 6 applies to the truck, the trailer, and the cargo because they were within Carey's care, custody or control, under the *Arrigo's* definition, at the time of the fire.

Applying the *Arrigo's* criteria, the court must first consider whether the damaged property was within the proprietary control of Carey at the time of the fire.  Under *Arrigo's*, any property that was within Carey's proprietary control will be subject to Exclusion 6 without further inquiry.  The court determines that the tractor was within Carey's proprietary control because Carey owned the tractor.  Therefore, damage to the tractor itself is subject to Exclusion 6, and Amerisure has no duty to cover or indemnify Carey for such damages.  *See generally Century Surety Co. v. Charron*, 583 N.W.2d 486, 488 (Mich. App. 1998) ("Coverage under a policy is lost if *any* exclusion applies to an insured's particular claims.") (emphasis added).

As for the attached trailer, it was apparently owned by FFI, not Carey, so it was not within Carey's proprietary control.  The court then considers whether FFI's trailer was within Carey's "possessory control."  *Arrigo's* seemed to equate possessory control with "physical control."

-52-

*Arrigo's*, 221 N.W.2d at 213.  *Arrigo's* then adopted the definition of "physical" as "bodily as contrasted with mental" and the definition of "control" as "to exercise restraining or directing influence over."  *Arrigo's*, 221 N.W.2d at 213.  At the time of the fire, Carey's employee was driving the vehicle on the highway, so common sense dictates that he and nobody else was exercising physical restraining or directing influence over the trailer that was attached to his tractor.  Or, to put it in the language used by *Arrigo's*, FFI's trailer was "under the immediate supervision of the insured [Carey's driver] and" was "a necessary element of the work involved," *Arrigo's*, 221 N.W.2d at 212-13, i.e., FFI hired Carey specifically to pull its tractor to the Florida destinations where its cargo was to be unloaded.  Therefore, damage to the attached trailer is subject to Exclusion 6, and Amerisure has no duty to cover or indemnify Carey for such damages.

As for the cargo, it was not owned by Carey, so it was not within Carey's proprietary control.  The court could then consider whether the cargo was within Carey's "possessory control."  Hoping for the possessory-control determination to dictate the outcome, Carey places great weight on the fact that its driver, Fowler, was not authorized or able to open the trailer or touch the cargo in any way, nor was he even told the nature of the cargo.  Carey's driver testified as follows with regard to the first of the three shipments in that trailer:

> Q.   In addition to receiving the bills of lading, would you have also received packing slips or customer invoices from Perrigo?
> A.   Yes, you will.
>
> Q.   Okay.
> A.   But they are sealed.  They are sealed.
>                               * * *
> Q.   Now, when you were loaded at Perrigo, did they follow the same procedure as you had talked about earlier?
> A.   Yes.
> Q.   You pull in.  They tell you where to back your truck into.  Right?
> A.   Yes.

Q.      A little bit before that, you stay in the truck, they open your doors, tell you to back up the next – last 10 feet?

A.      I open my doors to back in.

Q.      You open your doors to back in?

A.      At Perrigo.

Q.      At Perrigo.  You back into the dock, they load you?

A.      They load you.

Q.      They tell you pull forward?

A.      And they seal it.

Q.      They seal it while you are still in the trailer – or truck.  Right?

A.      Yes.

Q.      Okay.  Then they say okay, Derek, come on out?

A.      I walk back.

Q.      We will show you the seal?

A.      Check the seal, down the road I go.

* * *

Q.      Now, your first load you drop off at Amerisource-Bergen in Orlando, Florida.  It looks like you had 679 cases of product.

A.      Yes.

* * *

A.      The only thing I know about is what I see on the paper.  Okay.  If it says this is what goes there, that is where I am going.  I mean, I don't – with Walgreen or anybody else with this product, you don't mess within nothing.  You stay right where – you are not allowed to unload it, you are not allowed to touch it.  It is their product, they do it.

* * *

Q.      Do you go inside at all?  Do you stay in your truck?

A.      Nope, they unloaded it.

* * *

Q.      After they unloaded it – did they let you watch the unloading at all?

A.      No.

Q.      Did you ask to?

A.      No, I didn't.

* * *

Q.      Would they have returned to you the bill of lading noting any shortage in count or damage?

A.      Yes, they would.

Q.      Did they?

A.      Yes.

-54-

Q.   Okay.  These folks at Amerisource-Bergen, what did they note?  What was deficient or what didn't match up?

.   A.   I couldn't tell you.  He just handed it to me.  I never even looked at the bill.

* * *

Q.   Then how do you know if the load was damaged or short?

A.   That wasn't none of my concern.

* * *

A.   It wasn't standard procedure for me to look at it because it was a sealed load.  A sealed load is none of my concern.  It's Steve [Carey]'s.

Fowler Dep (Carey's Opp Ex 2) 46:11-16 and 47:23 to 48:20 and 49:21 to 50:7 and 56:9 to 58:6.

Seizing upon this and similar testimony by its driver, Carey argues that

> [t]he loading of the cargo in question is accomplished under a sealed system during which Mr. Fowler could not observe the loading or gain access to the semi-trailer.  In fact, the semi-trailer could only be accessed by authorized personnel.  Mr. Fowler would have to damage the semi-trailer or cut the seals in order to reach the contents.  Similarly, Mr. Fowler would have no access to the contents of the semi-trailer during the transport of the cargo.  Defendant's agent drove the semi-tractor that hauled the locked semi-trailer and its contents – that is all.  He had no possessory control over the contents of the semi-trailer for the purpose of the Policy's exclusion [number 6].

Carey's Opp at 11.

Because Fowler's testimony is not disputed, the court finds, for purposes of both Amerisure's motion and Carey's motion, that Fowler had no access to the cargo and no opportunity to personally handle or tamper with the cargo.  But even if Carey's driver had no "access" to the cargo, it was placed in his care, as he had the authority and the responsibility to transport the cargo safely to its destination in Florida.  His conduct (driving) could ensure that the cargo reached its destination intact, or conversely, he could cause the cargo to be damaged by a collision.  Common sense militates against finding the cargo to be outside the driver's "care, custody, or control" when it was expressly entrusted to him and its fate depended directly on his driving.

Moreover, even if Fowler's testimony constituted an appealing argument against "care,

-55-

custody or control" at first blush, *Arrigo's* held that "distinguishing whether the damaged property is necessary to the insured's work or merely incidental thereto is *the most valuable criterion*" in determining whether the property was within the insured's care, custody or control. *Arrigo's*, 221 N.W.2d at 213 (emphasis added). Given that holding by *Arrigo's*, this court is not free to elevate some other criterion to paramount position when evaluating care, custody or control. The cargo certainly was "necessary" to Carey's work, because FFI hired Carey specifically to deliver that cargo in a safe and timely fashion to the Florida destinations.[22] Accordingly, damage to the cargo is subject to Exclusion 6, and Amerisure has no duty to cover or indemnify Carey for such damages.[23][24]

---

[22]

*Arrigo's* is readily distinguishable on this score. The insured there was a garage in the business of repairing trailers of cargo trucks. *Arrigo's*, 221 N.W.2d at 208. While the insured's employee was using a welding device in an attempt to repair a van, other employees noticed smoke coming from the van. The van had several locks, and the driver who had the keys was away; consequently, the insured's employees had to use a cutting torch on the locks and rear doors to gain access. Meanwhile, the fire continued to burn and damaged the cargo inside the vehicle. *Id.*

The Court of Appeals determined, "it is obvious that the contents of the van (which were inaccessible to the inured without destruction of property) were irrelevant to the [repair] work the insured was doing. * * * [I]t is debatable whether the insured was actually exercising physical control over the contents of the van." *Id.* at 213.

[23]

Great West also argues that Amerisure's motion for summary judgment should be denied because Amerisure "cannot offer this court any type of proof or evidence [as to] how it, as the insurer of Carey, interprets and applies its own policy exclusion upon which it now relies." Great West's Opp to Amerisure MSJ at 12. Great West complains that it

tendered to Amerisure a request for production requesting a copy of each and every claims file, denial of coverage, reservation of rights, or any other correspondence in Amerisure's possession which has addressed or otherwise the care, custody, and [sic, or] control exclusion . . . . In response, Amerisure objected and filed an affidavit that it was unable to respond to the request because it had no method to reasonably do so. In addition, contrary to its requirements and duty to supplement under Fed. R. Civ. P. 26, as well as the repeated inquiries of counsel for both Carey and Great West, as

### COUNTS TWO AND THREE:  UNJUST ENRICHMENT AND RESTITUTION

Amerisure's unjust-enrichment and restitution claims rest on the premise that Carey is not entitled to retain any of the benefit of a defense to which the policy did not entitle it.  *See* Amerisure's MSJ at 18-19. Although Amerisure succeeds in showing that it is not obligated to provide coverage to Carey, that does not necessarily mean that it is entitled to a refund of the money it has spent defending Carey in the underlying action so far.  On the contrary, as explained below, Amerisure had a duty to defend Carey in the underlying action until now, and therefore it is not entitled to require Carey to reimburse it for the cost of that defense.

The court will grant in part and deny in part Amerisure's motion for summary and Carey's motion for summary judgment as to counts two and three.

### THE SCOPE OF AMERISURE'S DUTY TO DEFEND

The only remaining issue is whether Amerisure had a duty to defend Carey, and if so,

---

to how Amerisure was applying the exclusionary clause to the case at issue, Amerisure has refused to respond.

*Id.* at 12-13 (record citations omitted).  This argument is of no avail.  If Great West or Carey believed that Amerisure was obligated to produce documents or otherwise make a fuller response to discovery requests, they could and should have filed a motion to compel.  Having failed to take such action, they cannot now be heard to complain that discovery was inadequate.

[24]  Carey cites several out-of-state decisions which held that similar "care, custody or control" exclusions applied to damages to both vehicle and cargo.  *See* Amerisure MSJ at 11-13 (discussing *Borden v. Howard Trucking & N.W. Ins. Co.*, 454 So.2d 1071 (La. 1984); *Carter v. Early American Ins. Co. of Montgomery*, 383 S.E.2d 185 (Ga. App. 1989); *Nat'l Ins. Co. v. Dade Moving & Storage, Inc.*, 683 So.2d 1113 (Fla. App. 3d Dist. 1996); *Andrew Mundo, Inc. v. Liberty Mut. Group*, 772 N.Y.S.2d 331 (N.Y. App. 2004)).  None of these decisions was applying Michigan law.

whether it still has that duty now that this court has ratified Amerisure's decision to decline coverage. *Cf., e.g., Yale Pubs. Schs. v. MASB-SEG Prop. Cas. Pool*, 2004 WL 2881889, *2 (Mich. App. Dec. 14, 2004) (p.c.) (P.J. Murphy, JJ. White & Kelly) ("we conclude . . . that the allegations that plaintiff received funds to which it was not entitled arguably met the policy definition of a wrongful act, and therefore defendant was required to defend, if not indemnify, plaintiff in the bankruptcy action.") (citing *Polkow*, 476 N.W.2d 382).[25]  The answer is yes, Amerisure had a duty to defend Carey, but that duty now terminates.

Amerisure relies on the principle that "[a]n insurer's duty to defend a lawsuit brought against its insured . . . arises solely from the language of the insurance policy." *See Stockdale v. Jamison*, 330 N.W.2d 389 (Mich. 1982); *State Farm v. Moss*, 452 N.W.2d 816 (Mich. App. 1989); *Farmers & Merchants Mut. Fire Ins. Co. v. Lemire*, 434 N.W.2d 253 (Mich. App. 1989); *Meridian Mut. Ins. Co. v. Hunt*, 425 N.W.2d 111 (Mich. App. 1988); *Oscar W. Larson Co. v. United Capitol Ins. Co.*, 64 F.3d 1010 (6th Cir. 1995).

But the same Michigan decisions also consistently hold that "an insurer has a duty to defend if the allegations of the underlying complaint *arguably* fall within the coverage of the policy." *Bristol West Ins. Co. v. Whitt*, 406 F. Supp.2d 771, 780 (W.D. Mich. 2005) (Quist, J.) (citing *Shefman v. Auto-Owners Ins. Co.*, 687 N.W.2d 300, 302 (Mich. App. 2004) (citing *Radenbaugh v. Farm Bureau Gen. Ins. Co. of Mich.*, 610 N.W.2d 272, 275 (Mich. App. 2000))) (emphasis added). Because an insurer has a duty to defend whenever coverage is even arguable, it is said that "the duty

---

[25]

*Contrast DaimlerChrysler Corp. v. Prof. Corp. Intelligence, Inc.*, 2005 WL 3500810, *3 (Mich. App. Dec. 22, 2005) (p.c.) (P.J. Murphy, JJ. Sawyer & Meter) ("Because the allegations in the underlying complaint do not even arguably fall within the coverage of the policy, there was no duty to defend.").

to defend is broader than the duty to indemnify." *Whitt*, 406 F. Supp.2d at 780 (citing *Auto-Owners Ins. Co. v. City of Clare*, 521 N.W.2d 480, 487 (Mich. 1994) and *Polkow v. Citizens Ins. Co. of America*, 476 N.W.2d 382, 384 (Mich. 1991)).  *See also Koski v. Allstate Ins. Co.*, 572 N.W.2d 636, 639 n.5 (Mich. 1998) (Brickley, J., for a unanimous Court) ("the duty to defend is broader than the duty to indemnify") (quoting *Am. Bumper & Mfg. Co. v. Hartford Fire Ins. Co.*, 550 N.W.2d 475 (Mich. 1996)).[26]

As the Michigan Court of Appeals has emphasized, "This duty is not limited to meritorious suits and may even extend to actions which are groundless, false, or fraudulent, so long as the allegations against the insured even arguably come within the policy coverage." *Detroit Edison Co. v. Michigan Mut. Ins. Co.*, 301 N.W.2d 832, 835 (Mich. App. 1980); *see also Auto-Owners Ins. Co. v. City of Clare*, 521 N.W.2d 480 (Mich. 1994) (an insurer can have a duty to defend even where the claims against the insured in the underlying action turn out to be groundless or frivolous).  An insurer has a duty to defend, "despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recovery that fall within the policy." *Detroit Edison*, 301 N.W.2d at 835 (citing *Dochod v. Central Mut. Ins. Co.*, 264 N.W.2d 122 (Mich. App. 1978)).

As evinced by the analysis needed for this court to determine whether exclusions 2 and/or 6 applied to bar coverage, there was doubt as to whether Great West's theories of recovery against

---

[26]

*See also American States Ins. Co. v. Hayes Specialties, Inc.*, 1998 WL 1740968, *4 (Mich. Cir. Ct. Saginaw Cty. Mar. 6, 1998) (Crane, Cir. J.) (calling the duty to defend "*considerably* broader than the duty to indemnify") (citing *Polkow*, 476 N.W.2d at 384) (emphasis added).

Carey in the underlying action might fall within the policy's ambit.[27]   "In a case of doubt as to whether or not the complaint against the insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor."  *Detroit Edison*, 301 N.W.2d at 835 (citing 14 COUCH ON INSURANCE 2d, § 51:45, p. 538); *see also Guerdon Indus., Inc. v. Fid. & Cas. Co.*, 123 N.W.2d 143 (Mich. 1963); *Postek, Inc. v. St. Paul Fire & Marine Ins. Co.*, 105 F. App'x 740, 742 (6th Cir. 2004) (referring to "the generous in which Michigan law looks at claims that target the insured" for the purpose of determining whether the claims trigger the insurer's duty to defend) (citing *Radenbaugh v. Farm Bur. Gen. Ins. Co. of Michigan*, 610 N.W.2d 272, 275-76 (Mich. 2000)).  Accordingly, there was enough uncertainty that Amerisure had a duty to defend Carey in the underlying action, at least initially.  *See Panther Machine, Inc. v. Acc. Fund Ins. Co. of America*, 2007 WL 258313, *2 (Mich. App. Jan. 30, 2007) (p.c.) (P.J. Fort Hood, JJ. Talbot & Servitto) ("Although this Court later determined that the estate's claim [against the insured] in the underlying action was barred by the exclusive remedy provision of the WDCA, the duty to defend arises when coverage is even arguable.  Therefore, the fact that the claim was ultimately barred does not mean that coverage was not arguable.").

The duty to defend, however, does not always last for the entire pendency of the underlying action.  Rather, "the duty to defend continues until that stage in the proceedings is reached where there is no longer any uncertainty as to the possibility of coverage."  *Senior Home Health Care, Inc. v. Sunrise Med. HHG, Inc.*, 2008 WL 3200621, *6 (E.D. Mich. Aug. 5, 2008) (Nancy G. Edmund,

---

27

        *Contrast Auto-Owners Ins. Co. v. Harrington*, 565 N.W.2d 839, 840 (Mich. 1997) ("we . . . find that Harrington's actions taken in self-defense fall *squarely* within the *plain language* of the exclusion. * * * [B]ecause we find that no allegations in the complaint even arguably come within the policy coverage, we find that the insurer has no duty to defend . . . .").

J.) (citing *Aetna Cas. & Surety Co. v. Dow Chem. Co.*, 44 F. Supp.2d 847, 853 (E.D. Mich. 1997)

(citing *American Bumper & Mfg. Co. v. Hartford Fire Ins. Co.*, 550 N.W.2d 475, 483 (Mich.

1996))), *recon. denied*, 2008 WL 3911814 (E.D. Mich. Aug. 19, 2008).

Today's decision eliminates the "uncertainty as to the possibility of coverage" for the

damages which Great West seeks to recover from Carey.  Accordingly, Carey's duty to defend

terminates today; it may now discontinue providing or paying for Carey's defense in the underlying

action. *See Protective Nat'l Ins. Co. of Omaha v. City of Woodhaven*, 476 N.W.2d 374, 376 (Mich.

1991) ("[I]t was 'the duty of [the insurer] to undertake the defense *until it could confine the claim*

*to a recovery that the policy did not cover.*'") (quoting *Jonesville Prods., Inc. v. Transamerica Ins.*

*Group*, 402 N.W.2d 46 (Mich. App. 1986)) (emphasis added); *see, e.g., Deer Creek Hunt Club, Inc.*

*v. Auto-Owners Ins. Co.*, 1997 WL 33347801, *3 (Mich. App. May 23, 1997) (p.c.) (P.J. Markey,

J. Michael Kelly, Cir. J. Talbot by designation) ("summary disposition is precluded because a

genuine issue of material fact exists regarding whether plaintiffs expected or intended any injury or

damage to occur to their neighbors through plaintiffs' operation of the hunt club. [D]efendant had

the duty to defend plaintiffs in the underlying action. *Once the issue of material fact is resolved, the*

*duty to defend may be eliminated because the insurer owes the duty to defend [only] until the insurer*

*has confined the claims against the insured to those theories that the policy would not cover."*)

(citing *American Bumper Mfg. v. Hartford Fire Ins. Co.*, 523 N.W.2d 841 (Mich. App. 1994), *aff'd*,

550 N.W.2d 475 (Mich. 1996)) (emphasis added); *cf. Meridian Mut. Ins. Co. v. Hunt*, 425 N.W.2d

111, 112 (Mich. App. 1988) ("Plaintiff filed the instant action . . . seeking a declaration that plaintiff

*no longer* had a duty to defend and indemnify . . . .") (emphasis added).

**THIRD-PARTY DEFENDANT ADRIATIC'S MOTION FOR SUMMARY JUDGMENT:**

**ADRIATIC'S DUTY TO INDEMNIFY CAREY**

Defendant Carey filed a third-party complaint against Adriatic Insurance Company ("Adriatic"), which responded with a motion for summary judgment. For the reasons that follow, the court will grant Adriatic's motion, holding that it has no duty to indemnify Carey for the cargo loss and no duty to defend Carey in the underlying action.

Adriatic issued commercial motor truck cargo policy number MC6693 to Carey, effective July 20, 2004 through July 20, 2005, with a policy limit of $100,000. *See* Adriatic MSJ Ex 6 (Affidavit of Adriatic President Joseph E. Taylor dated July 19, 2007 ("Taylor Aff")) ¶ 3 (stating that the copy of the policy attached to Adriatic's motion "is an accurate copy of the policy issued to Carey Transportation"); Carey Opp Ex A at 6 (Letter dated Oct. 27, 2005 from Adriatic to Michigan Insurance Comm'r) ("The limit of liability on the cargo policy is $100,000.00 . . . .").[28] The policy's coverage-granting provision, entitled Insuring Agreement stated, in its entirety:

> In consideration of the premium paid hereon and the particulars and statements contained in the written Proposal, a copy of which attaches hereto, which particulars and statements are warranted by the Insured to be true and are agreed to be incorporated herein, *the Company hereby agrees to indemnify the insured* named in the schedule, *for all risks of physical loss or damage from an external cause to lawful cargo in and/or on a truck while in their care, custody or control in the ordinary course of transit*, including loading and unloading, within the contiguous states of [the] U.S.A., the District of Columbia, and Canada. This insurance being [sic] subject to all the provisions, exclusions, terms and conditions contained in the following wording.

Adriatic's MSJ Ex 1 at 3 (emphasis added). It is undisputed that these three conditions for coverage

---

[28]Adriatic issued a separate physical-damage policy to Carey, Number CX-63991, in effect during the same period. Great West's Opp x B. Pursuant to this policy, Adriatic paid $50,000 to Carey for the loss of its tractor (also sometimes referred to as a "power unit"). This policy is not at issue in any of the motions filed in this action.

are met:  the cargo was in a covered truck, it was within Carey's "care, custody or control"; the loss

occurred in the United States.  Also, the policy's Definitions section generally defined cargo as "all

property or equipment not owned, hired or leased by, or loaned to the Insured or by or to the Agents

or servants of the insured," Adriatic's MSJ Ex 1 at 4, so the goods constituted "cargo."  The policy

concluded by stating, just above the  signatures of Adriatic's President and Secretary,

> THIS POLICY IS MADE AND ACCEPTED SUBJECT TO THE FOREGOING
> STIPULATIONS AND CONDITIONS, *together with such other provisions,
> agreements or conditions as may be endorsed hereon or added hereto*; and no
> officer, agent or other representative of this Company shall have power to waive or
> be deemed to have waived any provision or condition of this policy unless such
> waiver, if any, shall be written upon or attached hereto, nor shall any privilege or
> permission affecting the insurance under this policy exist or be claimed by the
> insured unless so written or attached.

Adriatic MSJ Ex 1 at 9 (capitalization in original, italics added for emphasis).  As will be discussed

below, those endorsements include Endorsement MFC-13, entitled "Target Commodities", which

excludes coverage for certain specified commodities under most circumstances.

Also attached to the policy (in the record) is a document entitled "Motor Truck Cargo

Application."  Diane Carey signed the application on behalf of Carey Transportation, and someone

representing Carey has handwritten responses to the questions on the application.  *See* Adriatic MSJ

Ex 2 at 3-4 (Affidavit of American Eagle Casualty Insurance Company employee Judy Kinsman

dated July 19, 2007) (stating that the application attached to Adriatic's motion "is an accurate copy

of the signed application received from Carey Transportation"); *id.* Ex 6, Taylor Aff ¶ 4 (same).  The

application begins by asking for the applicant's name, address, telephone number, policy period,

carrier type (private, common, contract, or leased), years of experience in this business, and terminal

locations.  Adriatic MSJ Ex 2 at 1.

The application then asks and instructs the applicant as follows, "*Type of Merchandise

*Hauled:  Do not use the term 'General Merchandise.'  If more than one commodity is carried[,] give percentage of load values; Load Values must be accurately stated as co-insurance applies*."  Adriatic MSJ Ex 2 at 1 (emphasis added).  The application offers an extensive, detailed list of 37 categories for Type of Merchandise: Appliances, Automobiles, Auto Parts, Boats, Building Materials, Candy, Canned Goods, Carpets, Chemicals, Clothing, Cotton, Containers, Eggs, Electronics, Explosives, Fertilizers, Furniture, Grain, Livestock, Liquors, Lumber, Machinery, Meat, Milk & Cream, Mobile Homes, Nuts, Oilfield equipment, Paper, Petroleum, Pipe, Poultry, Produce, Seafood, Steel, Textile, Tires, Tobacco, and then a catch-all category entitled "Other."  Adriatic MSJ Ex 2 at 1.  Carey handwrote responses indicating that it would be carrying the following types of merchandise (with the Carey representative's handwriting in quotation marks):

| | | | |
|---|---|---|---|
| Auto Parts | | "20% | $25,000" |
| Produce | | "30% | $30,000" |
| Steel | "Castings | 30% | $20,000" |
| Other | "Bissell Vacuums | 10% | $100,000" |
| | "Slim Fast | 10% | $30,000" |

Adriatic MSJ Ex 2 at 1.  The application next asked for Average Value Per Load, to which Carey responded "$30,000   95%", and Maximum Value Per Load, to which Carey responded "$100,000   5%."  *Id.*  At the end of the application, just above Carey's signature line, the application states,

> This application shall not be binding unless and until a policy is issued and payment made and then only as of the inception date of said policy and in accordance with all terms hereof, and the said *Applicant hereby covenants and agrees that the foregoing statements and answers are a just, full and true exposition of all the facts and circumstances with regard to the risk to be insured*, insofar as same are known to the Applicant; *and the same are hereby made the basis and a condition of the insurance, and a warranty on the part of the insured*.

Adriatic MSJ Ex 2 at 2 (emphasis added).

On the day of Carey's loss, May 11, 2005, it was not transporting *any* of the merchandise

-64-

types listed on its application, let alone in the proportions stated.  Instead, Carey was transporting

over-the-counter pharmaceuticals and/or vitamins and/or dietary supplements, on behalf of the

Perrigo company, to a Walgreen distribution center in Jupiter, Florida – including Naproxen, cough

syrup, cold and sinus medication, multi-vitamins, fish and cod liver oil.  *See* Adriatic MSJ Ex 3

(Perrigo invoice numbers 807254, 807257, and 807259, all dated May 9, 2005).  Adriatic denied

coverage by letter dated July 1, 2005, stating as follows:

> We are writing to advise that we are denying the captioned claim, and we outline our
> reason for denial and enclose supporting documents.
>
> The cargo that you were hauling, which was pharmaceutical supplies & vitamins, is
> not a covered commodity as described in your policy, or your proposal for coverage
> [application].
>
> Your policy clearly states that you are to be hauling 10% Slim Fast, 10% Bissell
> Vacuums, 30% Steel, 20% Auto Parts and 30% Produce.  If we would have known
> you would be hauling pharmaceutical supplies & vitamins prior to the time the policy
> was written, we would have rejected your application for coverage.

Carey's Opp to Adriatic MSJ, Ex A.  (The court finds that the July 1, 2005 letter was an outright

denial of coverage, not merely a reservation of rights.)  Carey complains,

> No other explanation for Adriatic's denial was provided, nor did Adriatic reference
> any language from the policy supporting its denial or any exclusion which would be
> applicable to the claim.  Further, Adriatic provided no explanation for the statement
> that they would have rejected Carey Transportation's application for coverage had
> Adriatic known that they would be hauling "pharmaceutical supplies and vitamins."

Carey's Opp at 3.  In July 2005, Carey did pay the policy limit of $50,000 for damage to the tractor,

but reiterated that it "denied the cargo portion of the claim in total . . . ."  Carey's Opp Ex A at 2

(Letter dated July 27, 2005 from Adriatic to Carey).

As to the cargo claim, Carey wrote to Adriatic for clarification on August 12, 2005, *see*

Carey Opp Ex A at 3, and Adriatic responded with a letter stating as follows:

> [B]e advised that our denial was based on the fact that your proposal for coverage made no mention that you would be transporting pharmaceutical supplies and vitamins[,] which are excluded commodities under the policy.
>
> [N]either [the] proposal [n]or [the] application for coverage mentioned pharmaceutical supplies or vitamins and if they did, we would have elected to refuse coverage as outlined in my letter of . . . July 1, 2005.

Carey's Opp Ex A at 4 (Letter dated August 16, 2005 from Adriatic to Carey). Carey filed a complaint with the Michigan Insurance Commissioner ("the Commissioner"), who asked Adriatic to respond. Adriatic responded to the Commissioner with an October 27, 2005 letter that reiterated its earlier denial explanation and, for the first time, invoked the Target Commodity Clause, Endorsement MCF-13, as a basis for denying coverage. *See* Carey's Opp to Adriatic MSJ, Ex A at 6. Adriatic also stated, for the first time, "The commodity is not shown in our rating guide, specifically because it is a volatile product and we do not accept coverage for such a product." *Id.*[29]

After Great West instituted the underlying action against Carey, counsel for Great West contacted Adriatic's counsel. In a letter to Great West dated February 22, 2006, Adriatic charged that Carey had made a "material misrepresentation as to the commodity hauled vs. what they declared they would haul over two policy periods" and that "[f]or this reason we denied coverage" for the cargo. Carey's Opp Ex A at 9; *see also id.* at 10-11 (Great West's response letter to

---

[29]

The record contains another copy of Adriatic's October 27, 2005 letter to the Commissioner. It is identical to the first copy in all respects except one: someone has crossed out the word "volatile" and handwritten the word "vulnirable" [sic] in its place. *See* Carey's Opp Ex A at 8.

The court makes no finding as to who made the alteration, when he made the alteration, or whether Adriatic ever sent the altered version of the October 27, 2005 to the Commissioner or to Carey. Given the policy language (including Endorsement MFC-13 and the application cargo declaration), those facts are not material to the existence of coverage for the cargo that was actually destroyed. *See* Carey's Opp at 16-17 (arguing that various items in the cargo do not meet the definition of "volatile" or "vulnerable").

Adriatic).  A few weeks later, Adriatic wrote to Great West again, explaining that while it did not

mean to use the term "material misrepresentation," it continued to maintain that

> [t]he proposal for what Carey Transportation would haul on their first policy was the same commodities as they described in their renewal proposal.  We never knew pharmaceuticals would be a commodity hauled until the loss of May 11, 2005 occurred.

> Had we known or had we been advised [that] they would be transporting pharmaceuticals then we would not have written coverage to begin with since we do not wish to insure pharmaceuticals and they are not a part of our underwriting guide.

Carey Opp Ex A at 12 (Adriatic's Mar. 13, 2006 letter to Great West).

Carey's third-party complaint seeks a declaration that Adriatic is required to indemnify

Carey for the loss of the cargo and to defend Carey in the underlying action, *Great West v. Carey*

*Transportation*, No. 1:2006-cv-106 (W.D. Mich.).  Adriatic's President maintains that "the issuance

of the policy was based upon the information provided by Carey Transportation in the application"

and he claims that Adriatic "would not have issued a commercial motor truck cargo policy to Carey

Transportation if the application had listed vitamins, drugs, and/or pharmaceuticals as the type of

merchandise hauled."  Adriatic MSJ Ex 6, Taylor Aff ¶¶ 5-6.  Adriatic also contends that coverage

for loss to such cargo is expressly excluded by the policy's terms.  Specifically, Endorsement MFC-

13, which was attached to the policy, provides in its entirety:

<u>TARGET COMMODITY CLAUSE</u><br>(MFC-13)

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

THIS POLICY IS AMENDED BY THE ADDITION OF THE PERIL OF THEFT.

*In case of loss or damage by theft to* alcoholic beverages (beer & wine excepted)[,] cameras, photographic supplies, cigarettes or other manufactured tobaccos, designer clothing, *drugs/pharmaceuticals*, electronic data processing equipment, furs/fur trimmed articles, guns & ammunition, precious metals, radios, televisions and

-67-

stereos, shellfish, swinging meat, textiles, tires, tubes & *vitamins or any other commodity not described in the declarations, the limit of the company's liability with respects [sic] to any one truck shall not exceed 10% of the load value or 10% of the amount of insurance for such truck stated in the schedule[,] whichever is less.* **There will be no coverage for these items under any other peril.**

All other terms and conditions remain unchanged.

Adriatic MSJ Ex 1 at 7 (emphasis added).

Carey asserts that "[t]he only defenses [Adriatic] should be allowed to argue are those which were contained in the original denial letter of July 1, 2005." Carey's Opp to Adriatic MSJ at 8. Carey invokes the principle that "once an insurer has denied coverage to its insured and stated its defenses, the insurance company has waived or is estopped from raising new defenses." *Id.* at 7 (citing *Smit v. State Farm Mut. Auto. Ins. Co.*, 525 N.W.2d 528 (Mich. App. 1995) and *Lee v. Evergreen Regency Coop.*, 390 N.W.2d 183 (Mich. App. 1986)).  The court rejects this argument for the same reason as discussed above: as a matter of Michigan case law, waiver or estoppel cannot be applied against an insurer where doing so would create coverage where none exists, i.e., where coverage for the particular loss or occurrence was either not-provided by the policy or was expressly, clearly excluded.

In  *Smit v. State Farm Mut. Auto. Ins. Co.*, 525 N.W.2d 528 (Mich. App. 1995) (P.J. Reilly, J. Taylor, and 14th Cir. J. Michael Kobza by designation), the Court of Appeals remarked,

> The limitation on the application of waiver and estoppel discussed in *Ruddock* has not been applied without exception.  In *Lee*, this Court identified two classes of cases decided since *Ruddock* in which estoppel or waiver was applied to bring within coverage risks not covered by policy terms or expressly excluded from the policy:
>
>> The first class involves companies which have rejected claims of coverage and declined to defend their insureds in the underlying litigation.  In these instances, the Court has held that the insurance company cannot later raise issues that were or should have been raised in the underlying litigation.  *Morrill v. Gallagher*, . . . 122

-68-

N.W.2d 687 ([Mich.] 1963); *Dickenson* [*Dickinson*] *v. Homerich*, .
. . 227 N.W. 696 ([Mich.] 1929).  These cases are closely akin to the
principle behind collateral estoppel.

The second class of cases allowing the limits of a policy to be
expanded by estoppel or waiver despite the holding of *Ruddock*
involves instances where the inequity of forcing the insurer to pay on
a risk for which it never collected premiums is outweighed by the
inequity suffered by the insured because of the insurance company's
actions. [The insurance company has either misrepresented the terms
of the policy to the insured, *see Industro Motive Corp. v. Morris
Agency, Inc.*, 256 N.W.2d 607 ([Mich. App.] 1977), and *Parmet
Homes, Inc. v. Republic Ins. Co.*, 314 N.W.2d 453 ([Mich. App.]
1981) . . . , or defended the insured without reserving the right to
deny coverage.]

*Smit*, 525 N.W.2d at 531 and 532 (quoting *Lee v. Evergreen Regency Coop. & Mgmt. Sys., Inc.*, 390

N.W.2d 183, 186 (Mich. App. 1986)).

The Carey-Adriatic situation does not fall within either of the putative exceptions to the

*Ruddock* rule that were recognized by the Michigan Court of Appeals in *Lee* and *Smits*.  To fall

within the first exception to *Ruddock*, Carey would have to show that Adriatic could and should have

raised the "Endorsement MFC-13" exclusion in the underlying litigation (*Great West v. Carey*).

Carey cannot make that showing, because the underlying litigation was stayed (pending the outcome

of this action) before the court even set a deadline for the parties to file dispositive motions.  To fall

within the second exception to *Ruddock*, Carey would have to show that Adriatic misrepresented

the terms of the cargo policy to Carey or defended Carey without serving the right to deny coverage.

Carey cannot make this first showing, because there is no evidence that Adriatic misrepresented the

terms of the cargo policy to Carey.  Nor can Carey make the second showing, because Adriatic did

not tender a defense to Carey without reserving the right to deny coverage – rather, Adriatic flatly

denied coverage and refused to defend Carey.

-69-

Having determined that waiver/estoppel do not prevent Adriatic from invoking the Endorsement MFC-13 exclusion or the policy's other terms limiting or excluding coverage, the court must determine whether the policy affords coverage for this cargo loss.  The court determines that it does not:  coverage never arose in the first place, and if it had arisen, it would have been excluded by Endorsement MFC-13.

Adriatic relies on the exclusion which "clearly states that there is no coverage for loss or damage to refrigerated and/or temperature controlled cargo *unless* the damage is caused by fire." Carey's Opp at 9.  Carey alleges that the cargo was being hauled in a temperature-controlled trailer, and Adriatic does not dispute that allegation, and the court finds that the cargo was being hauled in a temperature-controlled trailer.  Carey reasons that because the cargo was temperature-controlled and was damaged by fire, Carey reasons that "there is no exclusion for the damaged cargo and, in fact, there is an *affirmative* statement that such cargo *will* be covered under the policy." *Id.*  Carey's argument fails.  That exclusion's language "unless the damage is caused by fire" means only that this particular exclusion does not exclude the coverage sought.  It does not suffice to establish coverage in light of a non-coverage provision and a different exclusion.

First, the policy provides that it "IS MADE AND ACCEPTED SUBJECT TO THE FOREGOING STIPULATIONS AND CONDITIONS, *together with such other provisions, agreements or conditions as may be endorsed hereon or added hereto . . .*." Adriatic MSJ Ex 1 at 9 (capitalization in original, italics added for emphasis).

It might have been wise, out of an abundance of caution, if Adriatic had included language in the policy and/or the application expressly stating that the application is part of the policy.  *See, e.g., Farris v. Am. Creditors Life Ins. Co.*, 2006 WL 1290421, *2 (Mich. App. May 11, 2006) ("The

application for credit insurance . . . contains the following provision: 'What the Contract Is And How Your Statements Affect It.  The group policy, the application, and the certificate of insurance are the complete contract of insurance.'").  Nonetheless, by virtue of the recitation which Carey agreed to by signing the policy application – what Adriatic calls Carey's "proposal" for insurance – the parties made the application part of their contract.[30]  In the language of the application, Carey "*covenant[ed] and agree[d] that the foregoing statements and answers*" – its description of the types of merchandise and load value that it would be transporting while covered by the policy – "*are a just, full and true exposition of all the facts and circumstances with regard to the risk to be insured . . . .*"  Adriatic MSJ Ex 2 at 2 (emphasis added).  Moreover, Michigan law holds that "[t]he policy application, declarations page of [the] policy, and the policy itself construed together constitute the contract."  *Royal Prop. Group, LLC v. Prime Ins. Syndicate, Inc.*, 706 N.W.2d 426, 432 (Mich. App. 2005) (citing *Hall v. Equitable Life Ass. Society of the US*, 295 N.W. 204, 206 (Mich. 1940) ("the

---

[30]

Carey has not identified any policy language that might override the application language stating that the declaration of cargo types was a "condition" of the insurance, i.e., an essential term of the policy.  *Contrast Miller v. Progressive Corp.*, 742 N.W.2d 131 (Mich. 2007) (Markman, J., concurring in order denying leave to appeal):

> "[T]he person named in the policy" may be entitled to personal protection insurance benefits under the no-fault act.  MCL 500.3114(1).  Plaintiff contends that she is "the person named in the policy" in which her parents are listed as the named insureds because she is listed as an occasional driver on the declarations sheet, and the policy states that the "Declarations, endorsements, and application are hereby incorporated into and made a part of this policy."  However, the following statement immediately precedes the portion of the declarations sheet that lists plaintiff as an occasional driver: "Your Policy Premium Is Based on the Following Information *Which Is Not Part of the Policy*."  Therefore, it is clear that the portion of the declarations sheet that lists plaintiff as an occasional driver is *not* part of the policy, and thus plaintiff is *not* the person named in the policy.

*Id.* at 132.

application for the insurance policy and the policy issued thereunder construed together constitute the insurance contract") (citing, *inter alia, Hawthorne v. Metro. Life Ins. Co.*, 280 N.W. 777 (Mich. 1938))) (footnote 6 omitted). *See, e.g., Kuebler v. Equitable Life Assur. Soc. of the US*, 555 N.W.2d 496, 500 (Mich. App. 1996) (considering "the limiting language in the policy *and application*") (emphasis added).

The application left no doubt whether the policy would be in force if Carey's description of the intended cargo was not complete and completely accurate. The application declared as clearly as possible that "*the same* [statements and answers] *are hereby made the basis and a condition of the insurance*, and a warranty on the part of the insured." Adriatic MSJ Ex 2 at 2 (emphasis added). Based on this language, the court determines that the application required something more definite and reliable than a "best estimate" (as Carey would have it)[31], and that Adriatic had the contractual right to rely on Carey's listing of merchandise types in assessing whether to issue the policy. Then, having issued the policy in explicit reliance on Carey's specification of merchandise types, Adriatic

---

[31]

After characterizing the application's merchandise-type declaration as a "best estimate' of what the insured will be hauling", Carey opines, "These estimates give the insurer ample information about whether to accept the applicant as an insured and how to rate or underwrite the risk in order to calculate an appropriate premium for the risk being assumed." Carey's Opp to Adriatic MSJ at 10. This is an odd argument for Carey to make: the applicant's "best estimate" of its intended cargo can enable the insurer to make an informed decision about policy issuance and premiums *only if the insured actually hauls cargo that generally conforms to the merchandise types warranted by the insured.* On the day of the loss, Carey was hauling merchandise of a type that it had not listed on the application, and it was not hauling any merchandise of a type that it *had* listed on the application.

Under Carey's "logic", a trucking company could list whatever merchandise types it wished on the application, knowing, as the application emphatically advises, that the insurer would rely on that declaration in deciding to issue a policy, and in calculating a premium; transport entirely different merchandise types without the approval or even knowledge of the insurer; and then demand coverage, even though the insurer never had the opportunity to assess whether it was willing to insure cargo of that nature (let alone what premium it would charge if it were willing to insure).

had the right to deny coverage if a loss occurred to cargo that bore little or no resemblance to the intended cargo warranted by Carey on the application.

Under different factual circumstances, the court might need to consider whether Carey's cargo differed *materially* or *substantially* from the cargo that it warranted it would be carrying. That question would arise, for example, if Carey had transported cargo that contained only merchandise of the types it had warranted in the application, but in different proportions (say, 17% auto parts and 33% produce instead of the warranted 20% auto parts and 30% produce).[32]

But that is not the situation here. *None* of the cargo transported by Carey on the day of the loss comported with the merchandise types it had warranted in the application. The difference between the cargo it promised it would be carrying and the cargo it actually carried, was a profound difference in kind, not merely a difference in degree, product brand, product style, or proportion. If the policy application's warranty language is to mean anything, it must at least mean that such a

---

[32] Carey ruminates,

> For instance, what if Carey Transportation had a loss while transporting *Hoover* vacuums instead of *Bissell* vacuums? Would Adriatic argue that, since Hoover vacuums are not listed in the declarations, there is no coverage? Such an outcome would be absurd.

> Likewise, if Carey Transportation had been transporting a Slim Fast equivalent product by one of its competitors (such as Weight Watchers or Ensure) instead of the actual Slim Fast brand name, would coverage be excluded under that situation? If the percentages listed were off slightly (e.g., they were hauling 31% produce, instead of 30%), could Adriatic argue that all coverage is precluded? Further, as to these percentages, do the percentages represent the makeup of each individual trailer load, or do they represent the percentages of all loads to be transported during the policy period? How are the percentages calculated? By weight? By price? What if all but a few of the damaged items fit into one of these five categories? Is the whole claim denied or only the loss to the items not listed?

Carey's Opp to Adriatic MSJ at 10 (paragraph break added).

complete violation of the insured's merchandise-type warranty does not satisfy that essential "condition of the insurance." According to the plain language of the application portion of the contract, Adriatic's promise to cover cargo was conditioned on the cargo being true to Carey's description; because that condition was not satisfied, the insurance never came into being. Adriatic made clear that it did not agree to insure the types of cargo, let alone the particular products, that Carey was hauling, and coverage never existed for the latter cargo – even before application of any exclusion in the policy proper.

Moreover, even the court assumed *arguendo* that the application was not part of the parties' agreement, or that its terms somehow did not prevent coverage from arising, Carey would still not be entitled to indemnification. Even if coverage presumptively existed for this type of cargo, Endorsement MFC-13 provides that unless it is caused by theft, loss or damage to "drugs/pharmaceuticals . . . vitamins or any other commodity not described in the declarations" is not covered at all. Adriatic MSJ Ex 1 at 7 (theft of such cargo will be covered at 10% of the load value or 10% of the particular truck's insurance, whichever is less; "There will be no coverage for these items under any other peril [besides theft].").

The policy does not define the terms "drugs" or "pharmaceuticals" or "vitamins." Therefore, Carey argues, those terms are ambiguous and must be construed against the drafter (Adriatic), i.e., Adriatic should not be allowed to invoke the MFC-13 exclusion. Carey's argument lacks merit. "Michigan courts . . . may resort to a dictionary such as Webster's to establish the meaning of a term . . . ." *Tenneco, Inc. v. Amerisure Mut. Ins. Co.*, 2008 WL 4148996, *19 (Mich. App. Sept. 9, 2008) (citing *Citizens Ins. Co. v. Pro-Seal Serv. Group*, 730 N.W.2d 682, 687 (Mich. 2007) ("When considering a word or phrase that has not been given prior legal meaning, resort to a lay dictionary

-74-

such as Webster's is appropriate.") (citing *Green v. AP Prods., Ltd.*, 717 N.W.2d 855, 890 (Mich.

2007))).[33]  *See, e.g., Morinelli v. Provident Life & Acc. Ins. Co.*, 617 N.W.2d 777, 781-82 (Mich.

App. 2000) (defining the insurance-policy term "appropriate" by reference to a dictionary).

The Merriam-Webster Online Dictionary defines "drug" as, *inter alia*, "(2) a substance

intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease" or "(3) *a*

*substance other than food intended to affect the structure or function of the body*",

http://www.merriam-webster.com/dictionary/drug (emphasis added) retrieved September 18, 2008.

The 2006 Random House Unabridged Dictionary defines "drug" as "a chemical substance used in

the treatment, cure prevention, or diagnosis of disease *or used to otherwise enhance physical or*

*mental well-being*."  *See* http://dictionary.reference.com/browse/drug retrieved September 18, 2008

(emphasis added).  The court adopts these common definitions.  The court rejects Carey's proposed

definition of "drug", which is misleadingly incomplete; Carey mentions only substances that are

intended to diagnose, cure, treat, cure or prevent disease, conveniently leaving out the potentially

much broader language "substance other than food intended to affect the structure or function of the

body."  *See* Carey's Opp at 15 ("Many of these items, including the fish oil concentrate, the

joint/bone gelatin drink, the garlic tablets, and the flax, fish and borage oil tablets specifically state,

'this product is not intended to diagnose, treat, cure or prevent any disease.'  * * *  Others, including

the nose drops, vaginal yeast infection cream, Minoxodil hair growth solution, and night time sleep

aid also are not designed to treat any disease . . . .") (original emphasis omitted).

The Merriam-Webster Online Dictionary defines "pharmaceutical" as "a medicinal drug",

---

[33]

*Cf. Allison v. AEW Capital Mgmt., LLP*, 751 N.W.2d 8, 12 (Mich. 2008) ("When a statute
does not define a word, we may consult dictionary definitions to determine the plain and ordinary
meaning of the word.") (citing *Koontz v. Ameritech Servs., Inc.*, 645 N.W.2d 34, 39 (Mich. 2002)).

http://www.merriam-webster.com/dictionary/pharmaceutical[2] retrieved September 18, 2008, and it defines "vitamin" as "any of various organic substances that are essential in minute quantities to the nutrition of most animals and some plants, act especially as coenzymes and precursors of coenzymes in the regulation of metabolic processes but do not provide energy or serve as building units, and are present in natural foodstuffs or sometimes produced within the body", http://www.merriam-webster.com/dictionary/vitamin, retrieved September 18, 2008.  The 2006 Random House Unabridged Dictionary defines "vitamin" as "any of a group of organic substances essential in small quantities to normal metabolism, found in minute amounts in natural foodstuffs or *sometimes produced synthetically*."  *See* http://dictionary.reference.com/browse/vitamin, retrieved September 18, 2008.  The court adopts these definitions of "pharmaceutical" as well.

As evinced by the three invoices from Carey's customer, Perrigo, dated May 9, 2005, *see* Adriatic MSJ Ex 3, Carey's cargo at the time of the fire consisted of over-the-counter anti-inflammatories (containing substances such as Naproxen and Ibuprofen), cough suppressants, pain reliever/fever reducers, antacids, anti-hemorrhoidal medication, and vitamin/dietary supplements. Moreover, Perrigo's invoices contain this statement: "We hereby guarantee to the purchaser of the articles of *food and drugs described in this invoice* that they are not altered or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act of 1938 and the amendments thereof."  Adriatic MSJ Ex 3 (emphasis added).  More specifically, Adriatic has filed product descriptions, obtained from the Walgreens website, which describe items that were in the cargo and place them primarily in the categories "Vitamins & Nutrition" or "Medical Nutrition", with the others in the categories "Personal" and "Sleep Aids" and "Children's Pain and Fever Medications."  Specifically, the products for which Adriatic has provided Walgreens descriptions were:

-76-

Fish Oil Concentrate softgels, Adriatic MSJ Ex 4 at unnumbered pages 1-3;

Vitamin A&D Cod Liver Oil softgels, *id.* at 4-6;

Vitamin B-Complex & C caplets, *id.* at 7-9;

Joint/Bone Gelatine [sic] Drink Mix, Unflavored, *id.* at 10-12;

Extra Strength Ephrine Nose Drops, *id.* at 13-15;

Miconazole 3 Vaginal Antifungal Combination Pack, *id.* at 16-18;

Men's Minoxodil 5% Hair Regrowth Treatment, Extra Strength, Unscented, *id.* at 19-21;

Wal-Som Doxylamine Succinate, 25 mg tablets, *id.* at 22-24;

Gold Seal Prenatal Multivitamin/Multimineral Tablets, *id.* at 25-27;

Infants' Non-Aspirin Concentrated Suspension Drops, Grape, *id.* at 28-30;

Gold Seal Prenatal Multivitamin/Multimineral Supplement, Tablets, *id.* at 31-33;

Finest Natural Garlic, Tablets, *id.* at 34-36;

Extra Strength Fish Oil Concentrate, 1760 mg softgels, *id.* at 37-39;

Finest Natural Balanced B-50 USP B-Complex Vitamins, Caplets, *id.* at 40-42;

Finest Natural Flax, Fish & Borage Oils, Softgels, *id.* at 43-45.

Thus, Carey fails to show a genuine issue as to whether the cargo consisted entirely of items meeting commonly accepted definitions of drugs, pharmaceuticals, and vitamins. No reasonable factfinder could find that the cargo did not meet those definitions. Consequently, Endorsement MFC-13 applies to all of the cargo. In any event, by its terms, Endorsement MFC-13 applies not only to the listed commodities, but also to "any other commodity not described in the declarations." Carey has not identified a single item in the cargo whose merchandise type was described in its application declarations, so Endorsement MFC-13 applies on that basis as well.[34] Because the cargo was not lost

---

[34]

*Cf. Mesa Oil Co. v. Business Men's Ass. Co. of America* 476 F.2d 491 (9th Cir. 1963) (applying Arizona law):

Mesa, after noting that there is no definition of the term "drug" in the contract, offers three dictionary definitions of the term in attempting to demonstrate that even these common sources are in disagreement over the term's definition. Mesa then contends that the absence of a policy definition, combined with the differences in dictionary

by theft, MFC-13 excludes all coverage.[35]

Next, Carey argues that because Endorsement MFC-13 expressly provides *theft coverage* for items that the insured did *not* list in the declaration, it is

> inconsistent [with] Adriatic's argument that if a commodity is not listed in the declarations, there is no coverage for that commodity. In actuality, there are nearly two dozen such commodities listed in the Target Commodity Clause for which coverage will be provided regardless of whether the commodity is listed in the declarations.

Carey's Opp to Adriatic MSJ at 9. Carey cites *Dunn v. Detroit Fed'n of Musicians*, 256 N.W. 581 (Mich. 1934) for the proposition that "[i]f clauses in the application are inconsistent with clauses in the policy of insurance or exclusions relied upon and those documents were both prepared by the

---

> definitions, required the court to deny [the insurer's] motion for summary judgment. We disagree.

*Id.* at 493 (footnote 1 omitted).

[35]

Great West asserts that

> MFC-13 bears no application to this loss [because] that endorsement specifically only modifies and limits Exclusion (D)(7), which originally provides full coverage for loss or damage caused by theft. In a situation involving theft of the listed commodities, the policy indicates Adriatic is only responsible for reimbursing 10% of the total coverage available, or 10% of the loss, whichever is less. What this endorsement means is that if the loss is caused by theft, the remaining 90% of the claim that remains unpaid cannot be sought under any other coverage in the policy. Given that the loss at issue did not occur because of theft, but instead occurred because of a fire, Endorsement MFC-13 bears no application. A fair reading of the policy indicates that that endorsement cannot modify any other provision other than Exclusion (D)(7).

Great West's Opp at 7. Great West's argument is untenable. If Adriatic wished to write Exclusion D(7) differently, it certainly could have done so. Neither the endorsement nor any other provision of the policy states that the endorsement is somehow limited to modifying a particular exclusion in the body of the policy.

insurer, the clause which would otherwise defeat insurance coverage must be rejected." Carey's Opp to Adriatic MSJ at 6; *see also id.* at 8 ("inconsistencies in clauses within the policy and exclusions drafted by the insurer must not defeat coverage for the insured").

But Carey is mistaken. A more careful and common-sense reading of the policy application together with MFC-13 demonstrates that they are reconcilable. As noted above, at the very least, the application prevents the creation of coverage for merchandise of a type that the insured failed to declare on its application, and MFC-13 never comes into play. For items belonging to a merchandise type that the insured *did* declare on the application, the application does not prevent the creation of coverage, but MFC-13 allows limited coverage for loss due to theft and no coverage for loss due to other perils. There is no internal inconsistency.

Finally, Carey seems to argue that if the court adopts Adriatic's interpretation of the policy – i.e., treating the application declaration as part of the policy and enforcing Endorsement MFC-13 – the promise of coverage would be illusory. The court rejects that argument. Carey argues as follows:

> The endorsement purports to preclude coverage from a significant number of commodities, except under circumstances involving a loss by theft. [Adriatic] argues that there is no coverage for the items listed under any other peril. * * * [T]he commodities which are excluded under the endorsement are so broad that the exclusion tends to swallow any coverage which would otherwise be afforded under the terms of the policy.
>
> The commodities which are listed in the endorsement exclusion include the following: . . . . [T]he motor truck cargo application signed by Carey Transportation . . . lists a number of these *exact* commodities as items for which insurance *would* be provided. * * * If the Target Commodity Clause [Endorsement MFC-13] is to be enforced as Adriatic is requesting, there are a number of these items which would be acceptable in the application and for which premiums would be paid, yet would be excluded from coverage under this particular endorsement (except in the limited circumstances of a

loss by theft, and then only at 10% of its value).

Carey's Opp to Adriatic's MSJ at 11-12.

By referring to "items which would be acceptable in the application," Carey seems to suggest that Adriatic promised to cover loss of any item that Carey declared as its intended cargo on the application. Carey then tries to paint Endorsement MFC-13 as contradicting this supposed promise of coverage of all declared merchandise types. But neither the policy proper nor the application states that Adriatic will cover the loss of any cargo so long as it is of a merchandise type that the insured specifies in the application. The truth is more nearly the opposite. As explained above, the application makes clear that the declaration of merchandise types is a "condition of this insurance", such that insurance *never exists* for non-listed merchandise types that the insured failed to declare.

In other words, if cargo is of a merchandise type not declared in the application, that cargo never "gets" presumptive coverage in the first place, and there is no need to consider whether an exclusion (such as Endorsement MFC-13) might apply. Even cargo of a declared merchandise type is entitled to presumptive coverage *subject, as always, to any applicable exclusions.* Nowhere do the policy proper or the application state that cargo of a declared merchandise type is for some reason exempted from potential exclusions. In other words, for cargo loss to be covered, it is *necessary*, but not *sufficient*, that the cargo be of a merchandise type that the insured declared in the application. The second necessary condition for coverage is that the particular cargo not be governed by an exclusion.

Lastly, Carey has not demonstrated how Endorsement MFC-13 is unenforceable or otherwise infirm under Michigan contract and insurance law. (Again, the cargo for which Carey seeks indemnification was not one of the merchandise types that Carey declared on the application, so

Carey does not even reach the presumptive-coverage stage where the court would need to consider exclusions.) Suppose that the insured sought indemnification for cargo of a merchandise type which (1) it had properly declared in the application but (2) was a merchandise type for which MFC-13 limited coverage. The court's analysis would not be difficult. If the loss was caused by some peril other than theft, MFC-13 would exclude coverage. If the loss was caused by theft, MFC-13 would permit coverage up to 10% of the load's value, or 10% of the particular vehicle's insurance policy limit, whichever is lower. There is nothing ambiguous or otherwise impermissible about such policy terms, even if they are less generous than Carey hoped or expected.

Given this disposition, the court need not determine (1) whether Carey made a material misrepresentation to Adriatic or (2) if so, whether under Michigan law, that misrepresentation could render the Adriatic-Carey policy void or voidable. *See* Adriatic MSJ at 12-13 (relying on Policy § 14, Misrepresentation and Fraud); Carey's Opp at 17-18; Great West's Opp at 7-9 (contending that subsequent events show that "even if material misrepresentations had been made by Carey in its application, Adriatic still would have issued the policy."); Adriatic's Reply to Great West at 3.

## ADRIATIC'S DUTY TO DEFEND CAREY

Because Carey's cargo claim was not even arguably within the coverage of the Adriatic-Carey cargo policy, Adriatic could not have a duty to defend Carey in the underlying litigation in any event.

As a separate matter, Adriatic correctly notes that it never assumed a possible duty to defend in the first place. Carey argues as follows,

> [T]he cargo policy clearly contemplates that a defense will be provided by Adriatic
> for claims coming under this policy. Specifically, paragraph 9 of the policy contains

> the following clause: "If legal proceedings be taken to enforce a claim against the
> Insured as respects any such loss or damage, the Company reserves the right at its
> option without expense to the Insured, to conduct and control the defense on behalf
> of and in the name of the Insured."  If there was no duty to defend the insured, or if
> there was no intent on the part of Adriatic to provide a defense in the event their
> insured was sued on the policy, the clause never would have been included.

Carey's Opp at 19.  The court finds Carey's argument specious and contrary to the plain language of policy paragraph 9.  Adriatic merely reserved the *right*, "*at its option*," to undertake Carey's defense.  That is quintessential language conferring discretion, not a duty.  *Accord M.H. Lipiner & Son, Inc. v. Hanover Ins. Co.*, 869 F.2d 685, 688 (2d Cir. 1989) ("Article 10 of the Policy imposes no obligation to defend; in clear language, it only 'reserves the right' of Hanover to conduct the defense."); *Int'l Ins. Co. v. Red & White Co.*, 1995 WL 150517, *4 (N.D. Cal. Mar.28, 1995) ("[I]ts explicit reservation of the right to join in the defense directly *at its option* contradicts any possible *duty* to join in the defense.") (emphasis in original) (citing *Save Mart Supermarkets v. Underwriters at Lloyd's London*, 843 F. Supp. 597, 603 (N.D. Cal. 1994)).[36]

---

[36]

   *Cf. Century Boat Co. v. Midland Ins. Co.*, 604 F. Supp. 472, 481 (W.D. Mich. 1985) (Hillman, J.) (treating clause that gave insurer "the right, but not the duty, to defend or participate in the defense, *at its option*" as conferring discretion on the insurer, but ruling in favor of the insured on other grounds);

   *Hudson Ins. Co. v. Gelman Sciences, Inc.*, 706 F. Supp. 25, 26 (N.D. Ill. 1989) (where policy stated that "Hudson, at its option but not being required to, shall have the right and be given the opportunity to associate with the Insured in the defense or control of any claim", the court stated, "Gelman does not challenge Hudson's contention that this clause allows Hudson to enter into defense of claims against Gelman, but does not obligate Hudson to do so.  Gelman also has not offered any reasons why this court should not respect Hudson's choice not to defend Gelman . . . . This court thus will not disturb Hudson's decision."), *judgment aff'd*, 921 F.2d 92 (7th Cir. 1990);

### ORDER

Plaintiff Amerisure Mutual Insurance Company's motion for summary judgment on its amended complaint **[document #75] is GRANTED in part and DENIED in part.**

Defendant Carey Transportation, Inc.'s motion for summary judgment **[document #73]** on Amerisure's amended complaint **is GRANTED in part and DENIED in part.**

Third-party defendant Adriatic Insurance Company's motion for summary judgment **[document #70]** on Carey's third-party complaint is **GRANTED.**

On Amerisure's amended complaint,
the court **DECLARES** the following in favor of Great West and Carey:
1.   Before the application of Exclusions, all the damages sought against Carey in *Great West v. Carey* are covered by the Amerisure-Carey policy;
2.   Exclusion 2's exception b applies.  Therefore, Exclusion 2 does not apply.

On Amerisure's amended complaint,
the court **DECLARES** the following in favor of Amerisure:
3.   Amerisure has not waived, nor is it estopped from relying on Exclusion 2 or 6;
4.   Exclusion 6 is not so ambiguous as to be unenforceable;
5.   Exclusion 6 is not so ambiguous as to require submission to a jury for determination of what the parties intended by the language in Exclusion 6;
6.   There is no basis for predicting that the Michigan Supreme Court would find Exclusion 6 to be unenforceable as violative of Michigan or federal public policy.
7.   The truck, trailer and cargo were all in the care, custody or control of Carey at the time of the loss, as defined by *Arrigo's* (Mich. App. 1974).  Therefore, Exclusion 6 applies to the tractor, trailer and cargo, and Amerisure has no duty to cover or indemnify Carey or Great West for damage to those items of property.

On Amerisure's amended complaint,
the court **DECLARES** the following with regard to Amerisure's duty to defend Carey:
8.   Amerisure had a duty to defend Carey against all claims in the underlying action, *Great West v. Carey Transportation, Inc.*, No. 1:2006-cv-106 (W.D. Mich.), but that

-83-

duty terminates today.

9. Amerisure is not entitled to reimbursement from Carey of the expenses which Amerisure has incurred to defend Carey in the underlying action thus far.

10. Amerisure is no longer obligated to provide or fund Carey's defense in the underlying action.

On Carey's third-party complaint against Adriatic, the court **DECLARES** the following:

11. Adriatic has no duty to indemnify Carey for the cargo loss;

12. Adriatic has no duty to defend Carey in the underlying action.

This is a final and appealable order, because it resolves all issues as to all parties.

**IT IS SO ORDERED this 26th day of September 2008.**


/s/ Paul L. Maloney
Honorable Paul L. Maloney
Chief United States District Judge